ESTATE OF VICTOR P. CLARKE, DECEASED, VICTOR E. CLARKE, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Clarke v. Commissioner
Docket No. 6167-73
United States Tax Court
T.C. Memo 1976-328; 1976 Tax Ct. Memo LEXIS 75; 35 T.C.M. (CCH) 1482; T.C.M. (RIA) 760328; October 28, 1976, Filed *75 Held, In determining the fair market value of decedent's stock in three closely-held corporations for estate tax purposes respondent erred in relying solely on the stock prices of corporations deemed by him to be comparable. Held further, The corporations relied on by respondent were not engaged in the same or similar line of business as the subject corporations within the meaning of sec. 2031(b). Held further, The fair market value of decedent's shares of stock determined. Kenneth G. Anderson Suite 655, Florida National Bank Bldg., Jacksonville, Fla., and George H. DeCarion, Suite 1211, 100 Biscayne Blvd., Miami, Fla., for the petitioner.
Steedly Young, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent determined a deficiency in the federal estate tax due from the Estate of Victor P. Clarke in the amount of $904,700.78. [1] In his Amendment to Answer respondent asserts that the deficency in estate tax due is $1,046,229.95. Due to concessions by the parties the issues for our consideration are: (1) the value on the date of his death of 550 shares of the voting common stock of Gables Engineering, Inc. owned by decedent at that time; (2) *76 the value on the date of his death of 550 shares of the voting common stock of Gables Electronics, Inc. owned by decedent at that time; (3) the value on the date of his death of 15,000 shares of the nonvoting common stock of Gables Electronics, Inc. owned by decedent at that time; and (4) the value on the date of his death of 55 shares of the common stock of Atlantic Gear & Machine Co., Inc. owned by decedent at that time. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Victor P. Clarke (decedent) died testate on May 2, 1969, in Miami, Florida. Surviving him were his son, Victor E. Clarke, and his wife, Charlotte H. Clarke. The initial executors of decedent's estate were Victor E. Clarke and C. Palmer Parker. Upon the death of Parker, Benjamin F. McLeod became a coexecutor. At the time of the filing of the petition herein Victor E. Clarke and Benjamin F. McLeod both resided in Miami, Florida. Hereinafter *77 Victor E. Clarke will be referred to as petitioner. The federal estate tax return was timely filed with the District Director of Internal Revenue, Jacksonville, Florida. Decedent's death brought down the curtain on a long and distinguished career in the mechanical engineering field. Having been graduated in 1926 from Yale University with a degree in mechanical engineering, he was employed by Westinghouse Corporation from 1926 to 1929. He then commenced employment as a design production engineer with the radio manufacturing branch of Pan American World Airways. In this capacity he designed various original radio and electronic devices including a remote control panel that was later to become the principal product of Gables Engineering, Inc. (hereinafter Engineering). During his employment with Pan American and the period of his operation of Engineering and Gables Electronics, Inc. (hereinafter Electronics), decedent built a broad scope of business associations and enjoyed an excellent business reputation both of which were instrumental in the successful operation of his businesses. In 1946 Pan American ceased production of its own radio equipment. Decedent elected not to stay *78 in its employ in a different capacity and instead, with others, caused the formation of Engineering. Engineering was organized under the laws of the State of Florida in March, 1947. At all relevant times, its principal place of business was located in Coral Gables, Florida. At its inception the stock of Engineering was held in the following proportions: decedent, 51 percent; Charlotte H. Clarke, 4 percent; Robert S. Rich, 41 percent; Sarah W. Rich, 4 percent. In 1948, decedent acquired the stock of Sarah W. Rich, and Charlotte H. Clarke acquired the stock of Robert S. Rich. There were no other sales of the stock of Engineering and at all times subsequent thereto, through the date of decedent's death, the voting common stock of Engineering was held 55 percent by decedent and 45 percent by Charlotte H. Clarke. At the time of decedent's death Engineering had capital stock authorized and outstanding as follows: [2]
Shares
Shares Type
Authorized
Par
Outstanding
Common
1,000
No par
1,000
Common nonvoting
100,000
$3.00
90,848
7 percent preferred nonvoting
100,000
3.00
45,000
At that time the outstanding stock of Engineering was held as follows: Type
Shareholder
No. of Shares
Common
Decedent
550
Charlotte H. Clarke
450
1,000
Common nonvoting
Victor P. Clarke
Foundation, Incorporated [3]
53,348
Engineering Employees
Pension Trust [4]
37,500
90,848
Preferred
Victor P. Clarke
Insurance Trust
45,000
*79 The dividend rights of these classes of stock at the time of decedent's death were as follows: Common (voting):
As declared by the board of
directors.
Common (nonvoting):
As declared by the board of
directors provided, however, that
where a dividend (cash or stock)
was declared with respect to the
common voting stock, a dividend
of double that amount per share
was required to be declared and
paid with respect to the nonvoting
stock.
Preferred
7 percent per annum noncumulative.
For the years 1964 through 1969, [5] *80 the dividends declared and paid by Engineering were as follows: Class of Stock
Dividend Paid
Preferred
$9,450 (21 cents per share) per annum
Voting common $100 (10 cents per share) per annum
Nonvoting common
$18,169.60 (20 cents per share)
per annum
Under Engineering's Certificate of Incorporation, as amended, in the event of dissolution or liquidation the holders of the preferred stock were entitled to receive the par value thereof prior to any distributions with respect to the common stock. Thereafter the holders of the nonvoting common stock were entitled to receive the par value thereof with the remaining assets then becoming available for distribution to the holders of the voting common stock. Civilian aircraft production may be subdivided into two categories: commercial transport manufactured for airlines and the general aviation field *81 comprising all civilian aircraft (other than commercial aircraft) such as single or twin engine aircraft and small jets. The primary market for the products of Engineering was the commercial air transport market. During the period 1966 through 1969 between 85 and 92 percent of its sales were to that market while but 8 to 15 percent of its sales were to the general aviation market. None of Engineering's sales were to the military aircraft market. One of Engineering's assets was the ability of decedent to improvise and to cooperate on a personal level with his customers. For this reason, the detailed written specifications, review, overhead and staffwork required by military procurement procedures impelled decedent to forego the military aircraft market. The primary product of Engineering was its G-Series control panel, an electromechanical device normally mounted in the cockpit instrument panel. The function thereof was the tuning of radios, radar, distance measuring equipment, and other electronic devices produced by manufacturers other than Engineering. Due to the different preferences of the various airlines, Engineering produced its G-Series control panels on a customized basis. *82 Although the varying designs devised by decedent performed the identical function they differed with respect to the configuration, color, knob arrangement, wiring details, and the presence of peripheral switches.Although such variations appear minor they were of consequence to the airlines for safety reasons. Decedent built an excellent reputation for having a facility to respond to his customers' particular problems in a prompt reliable manner.This reputation, coupled with the inability of other major companies to customize effectively, enabled Engineering to become the leader in the "customized" control panel business. Typically, the panels (as well as other products of Engineering) were shipped to airframe manufacturers which installed the products. Normally, a substantial lead time existed between the order and delivery of an airplane. Decedent's design ability and flexibility enabled the airlines to delay certain decisions and actions relative to instrument panel design and further contributed to Engineering's success in the control panel field. In addition to the G-Series control panels Engineering produced five other main products. These were: frequency selectors, ABC *83 parts, G-825 tape players, navigation warning systems, and G-Series amplifiers. With the exception of the frequency selectors, all were sold exclusively to the commercial air transport market. A sales breakdown of these products for the years 1966 through 1969 follows. GABLES ENGINEERING, INC.
Sales Analysis Product Line
1966
1967
1968
1969
Fre [q] Selectors
810756 15 *
492808 8
597135 9
663339 13
ABC Parts [6]
258448 5
295933 5
308985 5
333692 6
G-Series Panels
3055218 56
3752078 61
4129771 65
3180639 61
G 825 Etc. [7] *84 403977 7
522562 8
536192 8
392614 8
Nav. Warning Systems [8]
385740 7
351270 6
314187 5
193064 4
G-Series Amp. & Misc. [9]
585193 10
731896 12
485846 8
434240 8
Total Sales
5499332 100
6146547 100
6372116 100
5197588 100
These products were electromechanical devices. Prior to decedent's death the development of electronic control devices, the increasing standardization of control panels, and the development of computers with programmed frequency and directional finders threatened to outmode Engineering's products. Engineering was not equipped to compete in the electronics and computer fields, in part, due to the prohibitive cost of research. All major phases of Engineering's operations were under the direct personal supervision of decedent. His strong personality dominated the company and his reputation was instrumental in facilitating the marketing of its products. Not only did Engineering employ no salesmen but it published no catalog other than information circulated to potential customers in the general aviation market relating to its frequency selectors. *85 Generally, its sales efforts were restricted to decedent's attendance at industry conferences. The only engineer, other than decedent, employed by Engineering was petitioner. The remaining personnel consisted of a foreman, a technical draftsman, and production personnel trained by Engineering. During the period 1966 through 1969 Engineering employed approximately 115 persons. Petitioner was graduated from Cornell University in 1955 with a degree in electrical engineering and joined the staff of Engineering in 1957. During his initial years with the company he performed specific assignments pursuant to his father's directions such as designing cockpit speakers. He later began accompanying decedent to industry meetings. Prior to the death of decedent, petitioner's duties broadened in scope. In 1967, when decedent suffered a heart attack petitioner became president of Engineering. However, until his death decedent remained the driving force behind Engineering. At the time of decedent's death petitioner was considered an unproven quantity within industry circles. Decedent received compensation from Engineering as follows: Year
Amount
1958
$ 80,576.09
1959
91,532.04
1960
100,728.76
1961
92,606.25
1962
90,690.42
1963
92,398.70
1964
126,273.15
1965
159,140.95
1966
180,940.50
1967
183,895.70
1968
128,683.00
As *86 noted above there were no sales of the stock of Engineering between 1948 and the date of decedent's death. However several companies investigated the feasibility of acquiring Engineering. King Radio Corp. (hereinafter King), an electronic equipment manufacturer, explored such an acquisition several months prior to decedent's death. King reviewed the business and financial position of Engineering and decided not to make an offer for the following reasons: (1) Information available to the industry, such as FAA projections, indicated a prospective decline in the production of commercial aircraft and a decline in the demand for Engineering's products; (2) Anticipated technological change imposed the spectre of antiquating Engineering's products; and (3) The health problems of decedent made his availability a question mark. The Avionics Division of Bendix Aviation Corporation (hereinafter Bendix) considered acquiring Engineering in 1968. Bendix, however, decided not to make the acquisition concluding that without decedent's services such purchase would bear no fruit. In about 1960, commercial airlines began to replace piston driven aircraft with jet powered aircraft. This replacement *87 program benefited Engineering and resulted in substantial profits in the years 1960 through 1964. The boom years for jet production however commenced in 1964 with a concomitant windfall in profits to Engineering. For the years 1958 through 1968 the after-tax profits of Engineering were: Year
Net Profit
1958
$ 33,896.00
1959
107,305.00
1960
250,897.00
1961
131,006.00
1962
78,331.00
1963
106,188.00
1964
307,365.07
1965
593,495.32
1966
703,492.47
1967
886,693.20
1968
876,899.00 In January, 1969, the Federal Aviation Administration of the Department of Transportation issued a forecast pertaining to civilian aviation during the 1970's. These projections indicated that by the year 1979 United States carriers would complete their shift to an almost entire jet aircraft fleet. A shift in emphasis was anticipated with an increase in stretch-jets, airbuses and jumbo jets. The increase was expected to be: End Of
1968
1979
Total civilian transport aircraft
2,452
3,480
Total jet fleet
1,344
3,200
The same report projected an increase in the number of general aviation aircraft from 114,000 in 1968 to 205,000 in 1979. In January, 1969 FAA published a forecast showing air carrier transport and general aviation production through *88 1968 and projected production thereafter. It projected a decline in air carrier transport aircraft commencing in 1969. The aforenoted projected decrease in production of air carrier transport was reflected in the baklog record maintained by Engineering. [10] This record shows the following: This Year
Prior Year
This Year
Prior Year
1968-Jan.
3,325,116
3,585,649
Feb.
3,322,794
3,318,264
March
3,506,961
3,606,8 75
April
3,205,129
3,467,391
May
2,995,605
3,475,119
554,994
June
3,007,985
3,392,027
553,963
549,709
July
2,8 32,772
3,294,540
543,325
505,430
August
2,637,046
3,357,221
567,955
534,942
Sept.
2,370,119
3,403,931
529,552 461,012
Oct.
2,156,856
3,296,397
539,422
503,487
Nov.
2,006,639
3,450,419
501,700
524,293
Dec.
1,776,985
3,40 0,214
358,983
471,458
1969-Jan.
1,791,164
3,325,116
414,257
512,429
Feb.
1,985,952
3,322,794
382,467
541,964
M arch
2,156,554
3,506,961
522,286
529,460
April
2,019,063
3,205,129
522,859
638,369
May
1,957,835
2,995,605
404,586
554,994
5,841,355
6,327,522
The decline in projected air transport production and the decline in the backlog of Engineering were the result of the interplay of various economic and industrial factors. Some of these *89 were: (1) The proposed repeal of the investment tax credit and the proposed extension of the income tax surcharge in April, 1969. (2) Interest rates increased in the first part of 1969. (3) Total corporate profits experienced a downturn after the third quarter of 1968. (4) The bull market came to an end on May 14, 1969 in part as the result of a shift in economic policy from one of monetary expansion and growth to one of inflation control. (5) The year 1969 was a worrisome one for the airlines. With the introduction of large capacity jets on the horizon, traffic growth was faltering and load factors (the ratio of available seats to passengers carried) were low. The industry feared that the introduction of the 362 to 490 seat Boeing 747 in increasing numbers would produce a profit recession similar to that caused in the early 1960's by the original jets' increased seating capacity. Furthermore, the profit margins for United States carriers were decreasing. The December 31, 1968, balance sheet of Engineering, showed the following: ASSETS
CURRENT ASSETS: Cash
$1,510,769
Certificates of deposit
767,065
Trade accounts receivable
622,289
Accounts receivable from affiliated companies
21,771
Inventories
784,548
Total current assets
3,706,442
PROPERTY, PLANT AND EQUIPMENT, at cost
less accumulated depreciation of $357,580
1,880,399
INVESTMENTS IN SUBSIDIARIES
145,567
OTHER ASSETS
55,859
Total Assets
$5,788,267
LIABILITIES AND STOCKHOLDERS' EQUITY
CURRENT LIABILITIES: Mortgages payable to subsidiary within one year
$ 496,569
Long-term debt due within one year
13,002
Accounts payable to affiliated companies
385,967
Accounts payable
282,435
Dividends payable
27,720
Federal income taxes
108,551
Accrued liabilities
141,298
Total current liabilities
1,455,542
LONG-TERM DEBT:
51,322
STOCKHOLDERS' EQUITY: Capital stock
413,748
Retained earnings
3,867,655
Total stockholders' equity
4,281,403
Total liabilities and
stockholders' equity
$5,788,267
At *90 the time of decedent's death Engineering also owned the following nonoperating assets: (a) 100 percent of the 50,000 shares of voting common stock and 57.43 percent (50,000 shares) of the 87,060 outstanding shares of nonvoting common stock of Safety Guaranty Investment Corporation of Ft. Lauderdale, Florida (Safety Guaranty). Safety Guaranty was an investor in mortgages, an owner and operator of real estate, an owner of all the capital stock of Premium Acceptance Corporation (an inactive company that formerly engaged in financial casualty insurance premiums). It also owned all of the capital stock of Viclarke, Inc. [11] (an owner of real estate valued at $27,250). As of December 31, 1968, net book value of Safety Guaranty was $274,163 and for 1968 its net income was $5,651. Its real estate was valued at $162,713. (b) 100 percent of capital stock of Placid Ridge Estates, Inc., a small Florida real estate development. Its real estate was valued at $632,300. (c) G-Bar-E Ranch, a 4,810.19 acre cattle farm in Okeechobee County, Florida which was valued at $939,150. With respect to these assets, J. N. Lummus, *91 Jr., a Miami real estate appraiser, was retained to appraise the value of decedent's real estate interests and those of such corporations in which decedent had a stock interest as of May 2, 1969.In addition to those values set forth above Lummus valued land owned by Electronics at $75,000, and the leasehold interests of Electronics and Engineering at $105,250. The parties have stipulated that all of the aforenoted values are correct and the respective appraisers have made the appropriate adjustments to the book value of such assets. Piedmont Southern Life Insurance Company Policy No. 2726 (hereinafter the Piedmont policy) was a life insurance policy insuring the life of decedent. The policy was owned by Engineering which was also the beneficiary thereof. Upon the death of decedent, Engineering received the proceeds of the policy in the amount of $39,675. In his notice of deficiency respondent determined that the face amount of the policy was includable in decedent's gross estate. However, he has since conceded such is not the case and now asserts such policy was an asset of Engineering to be considered in valuing the company. The first expert witness called by petitioner was *92 Marion C. McCune (hereinafter McCune) of Coral Gables, Florida, whom the parties stipulated to be an expert in the appraisal of stock in closely held corporations. In valuing decedent's voting common stock in Engineering, McCune made two alternative assumptions. The first assumption was that a prospective purchaser could negate the dividend preference of the nonvoting shares through liquidation or charter amendment. His second assumption was that such prospective purchaser could not, without material legal risk, alter Engineering's charter or cause a corporate liquidation thereby eliminating the dividend preference. With respect to decedent's 550 shares of voting common of Engineering, McCune's opinion of the fair market value of such shares on May 2, 1969 was: A. Employing the first assumption stated above: Per share
$ 3,200
For decedent's 550 shares
1,760,000
B. Employing the second assumption stated above McCune concluded that the above values would be reduced by 25 percent, or: Per share
$ 2,400
For decedent's 550 shares
1,320,000
With respect to closely held stock of a company such as Engineering (and Electronics) McCune was of the opinion that the likely purchaser would be a successor *93 manufacturer rather than a passive investor. Since Engineering (and Electronics) had a number of rather unusual attributes, McCune believed that the number of prospective purchasers would be small. [12]
In reaching his final conclusions with respect to the value of the stock of both Engineering and Electronics, McCune took into account a number of factors including: (1) a personal inspection of the physical characteristics of the plant, equipment and personnel of both companies; (2) discussions concerning valuation, the nature of the industry, and other corporations in the industry, with a Vice-President of Collins Radio (a publicly held corporation which manufactures sophisticated electronic airborne radio, radar and other similar equipment) who was familiar with the subject companies and their products; (3) interviews with officers involved; (4) the history and background of Engineering *94 and Electronics; (5) their dividend records; (6) the nature of their businesses; (7) their management; (8) general economic conditions; (9) the fact that the abnormal avionics needs of the jet aircraft fleet caused by the rapid buildup in the period 1965 to 1969 had been largely supplied prior to the appraisal date; (10) his inquiry conducted to determine whether there were corporations engaged in the same or similar business the stocks of which were publicly held and listed on a stock exchange; (11) prospective future earnings and capitalization thereof; (12) book values and appraised values of underlying assets; (13) FAA statistics and projections; (14) the backlog records of Engineering and any other pertinent data which, in his opinion, an informed and responsible buyer would take into account. McCune isolated factors in Engineering which, in his opinion, would be favorable to a prospective purchaser, including: (1) the fact that 550 shares represented voting control; (2) the ability of Engineering to sell avionics components to the aircraft industry; (3) the increases in gross revenues and net profits in the 5 years preceding the valuation date; (4) Engineering's good business *95 reputation; (5) Engineering's good employer-employee relationships; and (6) Engineering's strong financial position. Unfavorable factors noted by McCune included: (1) fact that stock was closely held; (2) the fact that the balance of the stock was held by members of the decedent's family, a foundation, and a pension trust; (3) the cyclical nature of the commercial air transport industry; (4) the fact that the furnishing of avionics equipment to the jet fleet had been largely completed prior to the appraisal date, May 2, 1969; (5) the capital structure of Engineering; and (6) the adverse affect of decedent's passing. McCune conducted an investigation as to the occurrence of any recent sales of stock in either Engineering or Electronics which might be indicative of the value of the stock in issue. He found none. He also made a search for companies engaged in the same or similar business that were either listed on an exchange or were sold over-the-counter. He concluded that no such corporation existed. McCune then valued the stock of the subject companies on the intrinsic method utilizing a combination of a capitalization of earnings approach and a balance sheet analysis in reaching *96 his conclusions. In capitalizing earnings, McCune concluded that a prospective purchaser of Engineering would project annual future earnings to be $500,000. McCune used these anticipated earnings because he believed that, prior to May 2, 1969, the jet transport fleet had been substantially equipped and the rapid increase in earnings in the years 1964-1968 could not be expected to continue. He also believed that a prospective purchaser would be influenced, in projecting future earnings, by the non-availability of decedent, who had played a key role in the development and operation of Engineering, as well as the backlog reduction of Engineering. McCune applied a capitalization rate of 15 percent to projected net income of $500,000, thereby arriving at a value of stockholders' equity in the amount of $3,333,333 which he rounded to $3,330,000. He based the 15 percent capitalization rate on what he considered to be the risks attendant to the business. McCune determined the value of voting common stock by a residual method pursuant to which he assigned the following values to the outstanding preferred and nonvoting common stock. Indicated value of stockholders' equity
$3,330,000
Less: 45,000 shares of preferred at
141,750
liquidation value of $3.15 per share
90,848 shares of nonvoting common
stock at $4.50 per share [13] *97 408,816
Indicated value of stockholders' equity in
1,000 shares of voting common
$2,779,434
McCune added to this figure the net amount he estimated that Engineering would realize from sale of its nonoperating assets. He concluded that $1,531,000 would be so realized after reduction for selling expenses and income taxes. He added this amount to the aforesaid indicated value of common shareholders' equity, arriving at a total value of $4,310,434 (or $4,310 per share) for the 1,000 shares of voting common. McCune also analyzed the balance sheet of Engineering to determine indicated stockholders' equity. The December 31, 1968 balance sheet reflected retained earnings in the amount of $3,867,655 plus capital stock and surplus in the amount of $413,748. McCune adjusted these values to reflect the net increases in value of certain assets (real estate and investments in subsidiaries) as appraised by Lummus to reach an indicated value *98 of stockholders' equity per balance sheet in the amount of $4,453,956. Stockholders' equity thus determined was allocated as follows: Book value method - indicated value of
$4,453,956
stockholders' equity
Less: 45,000 shares of preferred at
141,750
$3.15 per share
90,848 shares of nonvoting common
408,816
at $4.50 per share
Indicated value of 1,000 shares of voting
$3,903,390
common stockholders' equity - book value
approach
Per share: $3,903,390/1,000 shares-per
3,903 *
share
Prior to his application of a discount for nonmarketability, McCune correlated his findings from book value of $3,903 per share and capitalization of earnings of $4,310 per share, to reach a preliminary determination of value for the 1,000 shares for the voting common of $4,000 per share. He then applied a 20 percent discount for non-marketability and arrived at his appraised value for the voting common of $3,000 per share. In applying the discount for lack of marketability, the factors considered by McCune were: (1) that stock in a closely held corporation is not readily marketable; (2) that Engineering had a variety of nonoperating assets; (3) that in the event of the sale of stock in *99 a closely held corporation, the seller would typically be required to assume personal warranties and representations, indemnities and contractual obligations with respect to undisclosed corporate liabilities; and (4) that the corporation had no tested management to succeed the decedent. Petitioner's second expert witness was Philip W. Moore (hereinafter Moore) whom the parties have stipulated to be a qualified expert. Underpinning his valuation of decedent's voting common stock in Engineering, were two alternative assumptions. The first was that the hypothetical willing buyer could successfully, without undue difficulty, alter Engineering's charter or cause it to be liquidated thereby negating the dividend preference of the nonvoting shares. With this hypothesis in mind Moore concluded that the fair market value of decedent's shares in Engineering was: Per share
$ 3,000
550 shares
1,650,000
Moore's second assumption was that the purchaser would be unable to alter the aforementioned dividend preferences. Based upon this assumption, he was of the opinion that the fair market value of decedent's shares of the voting common of Engineering would be reduced by at least 25 percent of the *100 aforenoted figures, to wit: Per share
$ 2,250
550 shares
1,237,500
Moore, in arriving at the foregoing values reviewed the following: (1) Engineering's records relating to its operation, management and ownership; (2) the general economic climate in the aviation industry; (3) the products and services rendered by Engineering; (4) the capitalization of Engineering; and (5) Engineering's earnings and balance sheets. Moore also personally inspected the business premises of Engineering (and Electronics) and interviewed their corporate officers. Upon conclusion of his review Moore determined that the most likely purchaser of decedent's interest in Engineering would be a well-financed owner operator rather than a passive investor. He further concluded that such hypothetical buyer would, in arriving at a purchase price, take into account the following factors: (1) decedent's dominance of Engineering; (2) the complexity of Engineering's capital structure; (3) that Engineering's products were of a specialized nature and were threatened by technological advancements; (4) that projections indicated a decline in the commercial aircraft industry; (5) that Engineering's products were not protected *101 by patents or copyrights; and (6) that Engineering's backlog had decreased in the period just prior to the death of decedent. In valuing the stock of Engineering Moore analyzed issues of publicly traded securities to determine whether companies existed that were engaged in the same or similar businesses as Engineering and that were also listed on an exchange. A similar search was made for publicly held over-the-counter securities. Based upon such analysis, Moore concluded that none of such companies examined were appropriate for use in valuing stock of Engineering as they were not engaged in the same or similar line of business. Having located no companies which in his opinion were engaged in the same or a similar business (with publicly traded securities) Moore utilized a capitalization of earnings and book value approach. Utilizing the average earnings of Engineering for the period 1959 through 1968 Moore was of the opinion that a hypothetical willing buyer could reasonably anticipate future earnings of $450,000 per annum. He used a 10 rather than a 5 year period because he believed the period, 1964 to 1969, to be a nonrecurring boom period for Engineering. He then applied a *102 capitalization rate of 17.5 percent [14] producing a capitalized value of stockholders' equity in the amount of $2,600,000 rounded off. Finally, Moore allocated this amount among the different classes of shares as follows: Stockholders' equity based on
$2,600,000
capitalization of earnings
Less: 45,000 shares of nonvoting common
141,750
preferred at $3.15 per share
90,848 shares at $6.00 per
545,088
share on outstanding nonvoting common
shares
Net indicated voting common stock-
holders' equity
$1,913,162
In making these allocations Moore valued the preferred stock at $3.15 per share based upon its liquidation rights. With respect to the shares of novoting common he concluded their value to be $6.00 per share based largely upon their dividend preference. Finally Moore added the per share value of Engineering's nonoperating assets such as the G-Bar-E Ranch and other real estate in which Engineering had a direct or indirect interest as appraised by Lummus. Moore reduced the $1,968,519 value of these assets to $1,669,000 by estimating the selling expenses and the taxes to be incurred in connection *103 with such sale. Hence, Moore added $1,669 per share ($1,669,000 divided by 1,000 shares) to the indicated $1,913 per share determined by the capitalization of Engineering's earnings, to arrive at a value per share of $3,582 for the voting common stock of Engineering. Moore also analyzed the balance sheet of Engineering as of December 31, 1968 and arrived at the following conclusions: Net book value
$4,453,956
Less: value of 45,000 preferred shares
141,750
at $3.15 per share
$4,312,206
Less: 90,848 shares of nonvoting
545,088
at $6.00 per share
Portion of book value attributable to
$3,767,118
voting common Based upon his indicated per share values of $3,582 (from the capitalization of earnings approach) and $3,800 (from the book value approach) Moore reached an indicated value of $3,700 per share. Moore concluded that if the dividend preference of the nonvoting common could be negated, the voting shares of Engineering had a value of $3,000 per share on May 2, 1969. In reaching his conclusion, he applied a discount of $700 per share from the $3,700 determined for non-marketability of the Engineering voting common stock. It was Moore's opinion that privately held stock was inherently less marketable *104 and hence less valuable than stock in a public company. In analyzing the question of marketability of these shares, he considered this to be a factor to be taken into consideration due to the difficulty of finding an appropriate or well-rounded purchaser who would undertake to acquire and operate a closely held corporation in a highly specialized field. In discounting for non-marketability Moore also considered the cost of publicly marketing a security such as Engineering stock which he approximated, based upon the size of the indicated offering, to be between 20 and 25 percent. Respondent called as an expert witness John O'Farrell (hereinafter O'Farrell or respondent's expert). O'Farrell's analysis of the value of decedent's stock interest in Engineering can best be understood by quoting directly in pertinent part as follows: The decedent, Victor P. Clarke, left 550 shares of Gables Engineering, Inc. voting common stock. This was 55 percent of the 1,000 shares outstanding and the lot represented voting control of the corporation. The corporation had 90,848 shares of nonvoting common outstanding and each of these shares had double the cash dividend rights of the voting common. *105 So in earnings that could be converted into cash dividends, now or later, the decedent's 550 shares of voting common amounted to but 550 / 2 X 90,848 + 1,000 = 0.3 percent of earnings to dividend potential of Gables Engineering, Inc. Consequently, it is meaningless to use an earnings forecast as a gauge of value for decedent's 550 shares of voting common. However, the decedent's 550 shares of voting stock gave the owner control of Gables Engineering, Inc. and in Florida a majority voting control can liquidate the company. On that basis, the value of the stock would be what it would have distributed to it in liquidation of the company. In this case, with a live and very profitable going concern like Gables Engineering, Inc., liquidation would have meant selling all of the assets of the company as a going concern, then distributing the net proceeds to the stockholders in a complete dissolution of the corporation. In those circumstances, the value question is, "What price could have been obtained for all of the assets of the company as a going concern?" For guidance in princing Gables Engineering, Inc. as a going concern on May 2, 1969, eight companies with publicly traded common *106 stocks were selected. These companies were in the same general industry of supplying airplanes with products and/or services and all but three were reasonably close to Gables Engineering, Inc. in size, as represented by annual sales. * * * The following ratios have been calculated for the eight common stocks: Ratio of common stock price on May 2, 1969 to book value of stock as of latest year end preceding that date, and Ratio of 5 year average earnings for 5 years preceding May 2, 1969 to book value of stock as of latest year end preceding that date. Using the ratios * * * a graphical presentation was prepared * * *. Ratios of 5 year average earnings to book value were located on the horizontal scale and corresponding ratios of stock price to book value on the vertical scale. There is considerable scatter in the vertical director (as is common for stocks of companies in relatively immature industries), so, for conservative minimum value indications, a trend line had been drawn through the lowest [15] points. For Gables Engineering, Inc. price *107 or value is the unknown that has to be obtained and the known is the ratio of average earnings to book value. Petitioner, because of a claimed cyclical nature of the company, believes that an 11 year average earnings should be used. This period seems to be contrived and extreme, but, in an attempt to bend over backwards in fairness, it is agreeable to use 10 year average earnings weighted 2 for the most recent 5 years average and weighted 1 for the more remote 5 year average. Referring to data on * * * the weighted 10 year average earnings are: 5 year average 1964-1968
$680,802 X 2
$1,361,604
5 year average 1959-1963
$127,916 X 1
127,916
Total 3
$1,489,520
10 year weighted average: $1,489,520 / 3 = $496,500 Taking adjusted December 31, 1969 net worth or book value of $4,155,444 [16] *108 * * * the ratio of 10 year weighted average earnings to book value is: $496,500 / $4,155,444 = 11.9 percent Returning to * * * an 11.9 percent average earnings to book value ratio on horizontal scale corresponds to a 2.2 trendline ratio of stock price to book value. Applying this ratio to Gables Engineering, Inc. book value, the value indicated for the company as a whole is: $4,155,444 X 2.2 = $9,142,000 The indicated value of $9,142,000 covers total equity of the company and to get down to voting common stock equity the liquidation payments to preferred stockholders and nonvoting common stockholders must be deducted. This is done as follows: Total equity value
$9,142,000
45,000 shares of 7 percent pre-
135,000
ferred stock @ $3 per share
90,848 shares of nonvoting common
272,544
stock @ $3 per share
Indicated value for 1,000 shares
$8,734,456
voting common
Indicated value for 1 share voting
$ 8,734
common
Indicated value for 550 shares
$4,803,700 [17]
voting common
The companies used by O'Farrell in his analysis were: AAR Corp., formerly Allen Aircraft Radio, Inc.; Safe Flight Instrument Corp.; Dallas Airmotive, Inc.; Simmonds Precision Products, Inc.; King Radio Corp.; Kellett Aviation Corp.; Stanley Aviation Corp.; and Narco Scientific Industries, Inc. The following is a brief summary and description of each. 1. AAR Corp. (formerly Allen Aircraft Radio, Inc.) (AAR): Together with its subsidiaries AAR made, overhauled, distributed, *109 and serviced navigation and communication equipment, flight instruments and related accessories for use principally in commercial and business aircraft. It also manufactured electronic equipment for the testing of such products. AAR operated avionics service and supply facilities at three major domestic airports, in Copenhagen, and in Amsterdam. Commencing in April, 1969, it engaged in the wholesale distribution of Cessna Aircraft and aircraft components in Oregon, Washington, and Idaho. It operated maintenance facilities, a flight training center, an aircraft rental service and an executive pilot service. It had eight wholly owned subsidiaries. Between 1967 and April, 1969, it had acquired all or part of nine other companies. In 1967 and 1968 its over-the-counter stock ranged in price between 9-1/2 and 23-3/4. 2. Safe Flight Instrument Corp.: It engaged in the design and manufacture of a variety of electronic, electrical and electromechanical devices and systems for use in many types of airplanes to increase airplane safety, to improve performance and to improve pilot control during low speed operation. Safe Flight instruments were sold primarily in the general aviation market *110 although it did make sales to commercial airlines. Its products were proprietary and had patent protection. 3. Dallas Airmotive, Inc.: This company overhauls, rents, exchanges, leases, purchases, and sells transport aircraft engines and their major accessories, assemblies and parts. In early fiscal 1970 its customers included 16 domestic and foreign airlines, 10 U.S. and foreign governmental departments, agencies, and air forces and more than 500 corporate and individual operators of transport aircraft. Between 1967 and 1969, its quoted stock prices ranged between 9 and 37-3/4. Its 1968 and 1969 sales, respectively, were $24,303,026 and $21,588,636 and its total assets exceeded $20,000,000. 4. Simmonds Precision Products, Inc.: Its stock was listed on the New York Stock Exchange. It manufactures electronic and electromechanical fuel gauging instruments and systems for aircraft, space and industrial electronics. It also manufactured turbine accessory systems and related components for aircraft jets; rocket engines; precision metal stampers; electrical components; activators and motors used principally to position control devices such as valves, antennas and flap and trim panels *111 on aircraft missiles and space vehicles; memory devices and related items for use in computers; and industrial instrumentation. It had 15 subsidiaries and 5,310 common stockholders.It had a large issue of convertible preferred stock. Its stock quotes had ranged between 21-1/8 and 34 in 1968. It acquired 10 companies between 1965 and 1969. For the year 1968 it had sales in excess of $58,000,000 and assets in excess of $54,000,000. 5. King Radio Corp.: This company's stock was listed on the American Stock Exchange in April, 1969. It makes electronic communication, navigation and flight control systems for civilian airplanes, including autopilots. Its products were primarily sophisticated electronic instruments.About 60 percent of its sales were in the general aviation market. In 1968, its stock ranged in price between 15-3/8 and 36. Its sales increased from $8,155,297 in 1967 to $11,216,774 in 1968. 6. Kellett Aircraft Corp.: It manufactures helicopters, aircraft parts and subassemblies, space vehicles, missile components and mobile photographic laboratories. It also engages in defense aircraft subcontract manufacturing and engineering. 7. Stanley Aviation Corp.: Its stock *112 is listed on the American Stock Exchange. The company designs and manufactures aircraft equipment, including escape and training devices for military airplanes. Its product line includes safety belts, ejection seats, seismographs, fuel duration indicators, ground pressure refueling panels, procedure trainers and escape capsules. As of June 30, 1966, it had assets worth $3,236,156 and for its fiscal year ended June 30, 1966 had sales of $2,380,069. 8. Narco Scientific Industries, Inc.: Its stock was listed on the New York Stock Exchange. It engineers and manufactures a diverse line of electronic equipment for general aviation, health and marine companies. It made 7 acquisitions after 1960 and had 10 subsidiaries. It had outstanding over 1,250,000 shares of stock. Its electronic equipment was sold in the general aviation market. A substantial amount of its sales was to hospitals and other customers in the health care field.
The relevant values placed upon the stock of Engineering are as follows: Decedent's
Per Share
Interest
Estate tax return $
$1,428,676
Notice of deficiency
8,500
4,675,000
Amendment to answer
8,734
4,803,700
O'Farrell
8,734
4,803,700
McCune (assuming liquidation)
3,200
1,760,000
McCune (without liquidation)
2,400
1,320,000
Moore (assuming liquidation)
3,000
1,650,000
Moore (without liquidation)
2,250
1,237,500
Electronics *113 was organized under the laws of the State of Florida in 1956. At all relevant times its principal office and place of business was situated in Coral Gables, Florida. When Electronics was incorporated decedent desired that Walter L. Dixon participate in its equity and through the early 1960's he was a stockholder of Electronics. In the early 1960's Dixon disposed of his interest in Electronics. This was the only sale of Electronics stock prior to decedent's death. The trade or business of Electronics was essentially that of a subcontractor. Its sole customer was Engineering for which it supplied labor for the assembly of certain of Engineering's products. Electronics' prospects were inextricably tied to those of Engineering. Hence, its future was largely dependent on those factors governing the prospects of Engineering which have been set forth above and will not be repeated here. Electronics maintained its records and filed its federal income tax returns on a fiscal year ending June 30. For its taxable years ended June 30, 1958 through June 30, 1968, its net after-tax profits were: Year
Profit
1958
$ 22,277.00
1959
23,979.00
1960
30,331.00
1961
36,869.00
1962
32,169.00
1963
36,228.00
1964
67,402.53
1965
46,813.93
1966
90,558.43
1967
125,606.55
1968
146,928.33
The *114 balance sheet of Electronics as of December o1, 1968, shows the following: ASSETS
CURRENT ASSETS: Cash
$121,792
Receivables
419,412
Total Current Assets
$541,204
INVESTMENTS: Safety Guaranty Investment Corp.
$ 36,833
of Ft. Lauderdale (37.30 percent
interest)
Unimproved land (Ft. Lauderdale)
26,392
Total Investments
$ 63,225
PLANT AND EQUIPMENT:
$102,452
Less Accumulated Depreciation
18,501
$ 83,951
OTHER ASSETS
$ 3,257
Total Assets
$691,637
LIABILITIES AND CAPITAL
CURRENT LIABILITIES: Payable and Accrued Expenses
$ 63,573
CAPITAL STOCK AND SURPLUS: Preferred Stock
$ -0-
Common Stock
60,100
Total Capital Stock
$ 60,100
Surplus
Paid-In $ 11,054
Retained Earnings 556,910
Appraisal
Total Surplus
$567,964
Total Capital Stocks and Surplus
$628,064
Total Liabilities and Capital
$691,637 Two of such assets had fair market values in excess of book value on May 2, 1969. These were the stock in Safety Guaranty and unimproved land in Ft. Lauderdale. Such adjustments were agreed to by the parties and are reflected in the appraisals of the respective experts. At the time of the decedent's death, Electronics had capital stock authorized and outstanding as follows: Shares
Par
Shares Type of Stock
Authorized
Value
Outstanding
Common
1,000
No par
1,000
Common nonvoting
16,700
$3.00
16,700
Such *115 outstanding stock was held as follows: Common Stock
Common Stock Non- Shareholders
Voting Shares
voting Shares
Decedent
550
15,000
Petitioner
450
Victor P. Clarke Foundation
1,700
1,000
16,700
The dividend (both cash and stock) rights of Electronics' common stock were as follows: Common voting
As declared by the board of directors
Common - nonvoting
As declared by the board of directors
provided, however, that where a
dividend (cash or stock) was declared
in respect to the common voting stock,
a dividend of double that amount per
share was required to be declared
and paid on nonvoting common stock. For the years 1964 through 1969 no dividends were declared or paid by Electronics. In the event of liquidation or dissolution the nonvoting common stock was entitled to receive $3.00 per share prior to distributions with respect to the voting common. From 1964 until decedent's death the officers of Electronics were: President and General Manager
Decedent
Vice President
Petitioner
Treasurer & Assistant Secretary
Charlotte H. Clarke
Secretary
C. Palmer Parker
With respect to Electronics, Moore valued its stock as of May 2, 1969 on the assumption that the dividend preferences of nonvoting shares would be negated. His *116 analysis produced the following valuations: 550 Shares of voting common
Per share
$ 420
550 shares of common
231,000
15,000 Shares of nonvoting common
Per share
$ 5
15,000 shares of nonvoting common
75,000
In light of the fact that Electronics was an assembly contractor for Engineering, and nothing more, Moore concluded that many of the factors upon which he based his opinions relating to Engineering were equally pertinent to Electronics. These included matters such as management, general economic conditions, the condition of the commercial air transport industry, the projected decline in air transport production, and the importance of the decedent to the business. Due to an absence of sales of Electronics stock and because he found an analysis of publicly held stocks not to be helpful, Moore valued Electronics on the intrinsic method. In so doing he analyzed earnings, book value, appraisal adjustments, prospective earnings, the impact of the loss of decedent upon such business, industry factors, the anticipated decline in commercial air transport production, and Electronics' dependence upon Engineering for its business. Moore first determined what he considered to be a reasonable projection *117 of future net earnings. He noted that average earnings for the period 1965 through 1969 were $95,462, with a low of $46,814 in 1965 and a high of $146,928 in 1968 and was of the opinion that a prospective purchaser could expect his average net future profit to be $75,000 per year. Moore believed the aforenoted factors and the specialized nature of Electronics' business entailed risk that warranted a 20 percent capitalization rate. Applying the 20 percent capitalization rate to the projected future earnings of $75,000, Moore found the indicated value for total stockholder equity in Electronics on the capitalization of earnings method to be $375,000. Moore next valued the nonvoting stock. He noted first that the corporate charter provided for a distribution to the nonvoting stock of $3.00 per share in the event of liquidation. However, because of the nonvoting stock's right to share in dividends at a rate double that to which voting shares were entitled, Moore concluded that the nonvoting shares had a value in excess of the $3.00 per share liquidating value. He added $2.00 per share for this factor, reaching a total of $5.00 per share for the nonvoting stock of Electronics, or $83,500 *118 for the 16,700 shares of nonvoting common outstanding. By subtracting the $83,500 determined value for the nonvoting common from total stockholders' equity he arrived at a preliminary indication of value of $291,500 for the 1,000 shares of voting stock outstanding, or $291.50 per share. Moore then adjusted this amount for the net proceeds Electronics could expect to derive from the sale of its nonoperating assets. The $115,000 appraised value of such assets was reduced for selling expenses to determine the net realizable value of these assets of $105.00 per share. This amount was added to the preliminary indication of value of $219.50 per share for voting common to reach Moore's conclusion that the indicated value of voting common shareholders' equity on the capitalization of earnings method was $396.50 per share. Moore, upon examination of Electronics' December 31, 1968 balance sheet, found book value to be $638,064. After adjustments required by the true market values of underlying assets, such as investments in Safety Guaranty and real estate, he determined the adjusted book value to be $690,414. Applying the above analysis to determine the fair market value of the 16,700 shares *119 of nonvoting common, Moore attributed $5.00 per share or $83,500 to the nonvoting common. This amount was subtracted from the $690,464 indicated book value for total stockholder equity to arrive at an indicated book value for the 1,000 shares of voting common in the amount of $596,964, or $597 per share. Combining the $396.50 per share determined on capitalization of earnings and the indicated book value per share of $597, Moore estimated that voting common had a value of $525 per share, prior to a discount for non-marketability. He then discounted the $525 per share value by 20 percent for non-marketability in accordance with the factors set forth above in his analysis of Engineering, thereby reaching his ultimate conclusion that voting common shares in Electronics had a value of $420 per share on May 2, 1969. Hence he valued decedent's 550 shares of voting common at $231,000 and decedent's 15,000 shares of nonvoting common at $75,000. Moore also valued the shares assuming no alteration of the nonvoting's dividend preference would occur. He concluded the value of voting common would be reduced by 25 percent from the foregoing, or from $420 per share to $315 per share. (For the *120 550 shares, this would be $173,250.) Adjusting the nonvoting common to allocate the voting common reduction to the nonvoting common would produce a value of $11.29 per share for the nonvoting common or a total value of $188,543. McCune concluded the hypothetical willing purchaser of decedent's Electronics stock would be an entrepreneur rather than a passive investor who would be required to commit himself to a business having a highly specialized product produced for a single customer. McCune concluded, therefore, that the most probable purchaser for the stock of Electronics would be a successor manufacturer. In making his appraisal McCune isolated what he considered to be favorable factors relating to Electronics. Included were: the fact that the 550 shares of voting common stock, without regard to the 15,000 shares of nonvoting common, represented control of the company; the fact that Electronics had demonstrated its ability to assemble avionics components for Engineering; the fact that there had been an increase in gross revenues of the company in the 5 years prior to decedent's death; the fact that the net profits in the same period had substantially increased; the fact that *121 good employee-employer relationships were present as was a good business reputation; and the fact that the December 31, 1968 balance sheet showed the company to be in good financial condition. Unfavorable factors considered by McCune to be pertinent included: that the shares were in a closely held corporation; that the balance of the voting shares was held by the son of decedent and the nonvoting shares were held partly by a foundation requiring purchaser to buy into a family business; that all sales of Electronics were to one of its affiliated companies which relied for its business upon the aircraft industry, a highly cyclical industry; that the furnishings of avionics equipment to the jet fleet had been largely completed prior to May 2, 1969; that due to the unusual characteristics of the nonvoting stock the purchaser would probably find it necessary to modify the dividend preference characteristics through liquidation or charter amendment; and that it would probably be necessary for an informed purchaser to acquire not only the 550 shares of voting common, but decedent's 15,000 shares of nonvoting common as well. McCune made a diligent search to try to find companies engaged *122 in the same or similar business with stock listed on an exchange or traded over-the-counter. His search failed to produce such a company or companies. Hence, he resorted to the intrinsic method of valuing the subject stock taking into account both capitalization of earnings and a balance sheet analysis. In capitalizing earnings McCune first determined that an informed purchaser would estimate future profits of $70,000 per year. The net profit for the year 1968 was $146,928.33.McCune concluded this high profit figure arose from a fortuitous but nonrecurring activity, namely that of outfitting the jet fleet and that the high sales and net profits for 5 years preceding death could not reasonably be expected to continue in view of the anticipated decline in commercial air transport production. He therefore considered profits of the company for the years 1964 and 1965 which were $67,402.53 and $46,813.93, respectively, and considered in reaching the $70,000 figure the absence of the decedent as well as Electronics' dependence upon one customer. These factors were again taken into account by McCune in arriving at a capitalization rate of 15 percent. Applying the 15 percent capitalization *123 rate to projected net income of $70,000, McCune developed an indicated value of stockholders' equity on the capitalization of earnings method of $466,666. McCune concluded that the value of the nonvoting common stock was $5.00 per share. Multiplying this by the 16,700 shares of nonvoting stock outstanding, he attributed $83,500 to the nonvoting common, leaving an amount attributable to voting common of $383,166. He then added $105,000 or $105 per share for that property not devoted to the manufacturing business. In arriving at this figure he assumed expenses of approximately 10 percent in disposing of these assets. Based on the foregoing McCune concluded that the capitalization of earnings approach resulted in the attribution of $572,000 to the 1,000 shares of voting common stock or an indicated value of $572 per share. McCune also analyzed the book value of Electronics as revealed by the Company's December 31, 1968 balance sheet. Appraisal adjustments were made to take into account the true value of investments in Safety Guaranty and real estate holdings. Adjusted book value was concluded to be $680,464 for total stockholders' equity on the book value method. With respect to *124 nonvoting common, McCune valued such shares as follows. Although no dividends had been paid on the nonvoting common shares since the organization of the company in 1956, McCune concluded that the nonvoting shares should be valued taking into account not only its right to receive $3.00 per share in the event of liquidation, but the expectation that Electronics would pay dividends on its nonvoting common. He valued the stock at $5.00 per share, or $83,500, which was subtracted from indicated book value total stockholders' equity. McCune therefore concluded that the indicated book value for the 1,000 shares of voting common was $596,964, or $597 per share. By combining the $572 per share value determined on the capitalization of earnings method with the indicated book value per share of $597 McCune concluded that the voting common had a value of $575 per share prior to discount for non-marketability. He then discounted the $575 per share by 20 percent for non-marketability in accordance with the same factors considered by him to be important with respect to Engineering. Hence, McCune ultimately valued voting common shares in Electronics at $460 per share. Thus, for the decedent's 550 *125 shares of voting common, McCune concluded such shares had a value of $253,000 and with respect to the 15,000 nonvoting common shares of decedent he concluded that such shares had a value of $5.00 per share or $75,000. Employing the assumption that the nonvoting common dividend preferences could not be negated through liquidation or charter amendment, McCune was of the opinion that the value of the voting common of Electronics would be reduced by 25 percent. Applying such reductions, the respective values of each share and decedent's 550 shares of voting common would be: Per share
For the 550 shares $345
$189,750
This reduction of the value of the common shares from $460,000 to $345,000 amounts to $115,000. Hence this amount must be added to the value of nonvoting common as previously determined. Per share and for the 15,000 shares, this results in the following: Per share
For the 15,000 shares
$11.88
$178,200
The analysis of respondent's expert, O'Farrell, with respect to the value of the stock in Electronics at issue is set forth in pertinent part below: The decedent owned 550 shares of voting common (55 percent of outstanding) and 15,000 shares of nonvoting common (89.8 percent) in *126 Gables Electronics, Inc. This ownership represented rights to 550 + 2 X 15,000 / 1,000 + 2 X 16,700 = 88.8 percent of dividends that could be paid by the company. This meant that the owner of these stocks, if rational and prudent, would use his control, represented by the 55 percent voting stock interest, to increase earnings and pay large dividends. So the key to the valuation is in earnings that could be anticipated. In estimating future earnings, the petitioner favors a projection of a 10 year average for the years 1960 to 1969, because of cyclical aspects of the business. Leaving out 1969, as not known as of valuation date, and weighting the 4 year average 1965-1968 as 2, and the 5 year average 1960-1964 as 1, * * * provide the following weighted 9 year average: 4 year average earnings 1965-1968: $477,312 total 1965-1969, minus $146,929
for 1969, and remainder of $330,383
divided by 4 = $82,577 Weighted 2
$165,154
5 year average earnings 1960-1964: $31,915 Weighted 1
31,915
Total
$197,069
Weighted 9 year average earnings: $197,069 / 3 = $ 65,690 Using adjusted total net worth (or book value of equity) of $655,736 as of December 31, 1968, * * * the ratio of Gables Electronics, Inc. average *127 earnings to book value was: $65,690 / $655,736, or 10.0 percent Locating 10.0 percent horizontally on the * * * graphical trendline, a corresponding 1.9 ratio of stock price to book value is located on the vertical scale. Applying the 1.9 ratio to the $655,736 adjusted book value, an indicated market price or value of $1,246,000 is found for the Gables Electronics, Inc. total equity interest as of May 2, 1969. This total of $1,246,000 is an indicated value for the company with special emphasis on earnings and dividend paying capacity. The decedent's interest was 88.8 percent of the equity on this basis, and in indicated value that would be: $1,246,000 X 88.8 percent, or $1,106,000 As Gables Electronics, Inc. was entirely dependent on Gables Engineering, Inc. for sale of its products, it was more vulnerable and less secure than most of the companies used in preparation of the * * * graph, so instead of a going concern premium add-on it is prudent to apply a 25 percent discount to the $1,106,000 indicated value to obtain an adjusted value of $830,000. Separating the $830,000 total value for the decedent's stocks into voting stock and nonvoting stock elements requires an estimate *128 for value to be applied to control feature in the 550 shares (55 percent of outstanding) of voting common stock. This control component would not be a great amount for a company like Gables Electronics, Inc. but should represent at least 10 percent of the $830,000 indicated value for decedent's package of 550 voting and 15,000 nonvoting common. On that assumption, the total indicated value is divided as follows: 550 shares voting common stock: Control element: 10 percent of $830,000 = $83,000 (a) Value per earnings and dividend unit: $830,000 - $83,000 / 15,000 nonvoting X 2 + 550 voting = $24.45 (b) per share 550 shares X $24.45 = $13,450 (c) Total value 550 shares voting common (a) + (c) or $175 per share = $96,450 15,000 shares nonvoting common: $830,000 total - $96,450 for voting, or $733,550 or $48.90 per share This separation of decdent's interest in Gables Electronics, Inc. into so much for voting common and so much for nonvoting common is merely of academic interest, because, as mentioned previously, a prudent owner would treat the two lots of stock as one property, use the voting control to exploit earning and dividend distributions to the nonvoting stockholders. Giving proper *129 consideration to the value affecting factors and particular attention to the economy, the trends in commercial air transportation, the condition and future of the civilian airplane parts and service industry, the history and prospects for the company, it is concluded that as of May 2, 1969 petitioners lots of Gables Electronics, Inc. common stocks had the following fair market values: 550 shares voting common stock: $96,450 total, or $175 per share 15,000 shares nonvoting common stock: $733,550 total, or $48.90 per share. The relevant values placed upon the stock of Electronics are as follows: 550 Shares of Voting Common
Decedent's
Per Share
Interest
Estate tax return
$395.72
$217,648
Notice of deficiency
727.27
400,000
Amendment to answer
175.00
96,450
O'Farrell
175.00
96,450
McCune (assuming liquidation)
460.00
253,000
McCune (without liquidation)
345.00
189,750
Moore (assuming liquidation)
420.00
231,000
Moore (without liquidation)
315.00
173,250
15,000 Shares of Nonvoting
Common
Estate tax return
$ 3.00
$ 45,000
Notice of deficiency
Amendment to answer
48.90
733,550
O'Farrell
48.90
733,550
McCune (assuming liquidation)
5.00
75,000
McCune (without liquidation)
11.88
178,200
Moore (assuming liquidation)
5.00
75,000
Moore (without liquidation)
11.29
88,543
Atlantic *130 Gear & Machine Company (hereinafter Atlantic Gear) is a Florida corporation, organized in 1966. It had 100 shares of authorized capital stock, par value $100, issued as follows: Decedent
55 shares
F. R. Herrick
45 shares
Upon incorporation decedent lent $4,500 to Herrick which Herrick used to acquire his interest in Atlantic Gear. This loan was reported on decedent's estate tax return as a note receivable in the amount of $4,500. Atlantic Gear was a specialized machine shop engaged in the manufacture of samll precision and semi-precision gears. Although it sold its products to others, Atlantic Gear's primary customer was Engineering. The operation of Atlantic Gear was principally directed by Herrick.
For the calendar years 1966 through 1969 the sales, pretax profits, income tax, and net profit were as follows: Pretax
Income
Net Year
Sales
Profit
Tax
Profit
1966
$ 56,871
$ (847)
$ --
$ 1,847
1967
102,197
15,711
191
15,520
1968
101,167
7,706
1,471
6,235
1969
126,397
15,159
3,669
11,490
As of December 31, 1968, the balance sheet of Atlantic Gear showed the following: Assets
CURRENT ASSETS: Cash
$ 1,906
Trade accounts receivable
5,232
Receivable from employees
4,129
Inventory, at cost which is less than market
607
Prepaid expenses
320
Total current assets
$12,194
MACHINERY AND EQUIPMENT AND FURNITURE
40,763
AND FIXTURES, at cost less accumulated
depreciation
OTHER ASSETS:
1,306
Total assets
$54,263
Liabilities and Stockholders' Equity
CURRENT LIABILITIES: Notes payable due within one year
$ 6,026
Accounts payable
10,703
Federal income taxes
1,691
Accrued liabilities
2,203
Total current liabilities
20,623
NOTES PAYABLE DUE AFTER ONE YEAR:
2,761
STOCKHOLDERS' EQUITY: Common stock - authorized 100 shares of $100
10,000
par value - outstanding 100 shares
Retained earnings, per accompanying statement
20,879
Total stockholders' equity
30,879
Total liabilities and
stockholders' equity
$54,263
*131 The machinery, equipment, furniture and fixtures consisted primarily of special machine tools with a book value of $32,165. These tools were designed for the manufacture of gears required by Engineering and were valued by petitioner as of decedent's death at $18,000. On decedent's federal estate tax return his 55 shares of Atlantic Gear were valued at $31,185. In reaching this figure the earnings for the years 1966 through 1969 were averaged producing an average of $8,100 per year which was capitalized using a multiplier of 7. Respondent used the same multiplier but eliminated the year 1966 from his computation of average earnings in valuing decedent's 55 shares at $42,350. OPINION The issue before us involves the valuation of blocks of stock in three closely held corporations owned by decedent at the time of his death. As is typical in cases of this genre both parties rely on the opinions of experts that comport with their respective views. In addition petitioner clothes the future of the respective companies in black while respondent urges us to view them with rose colored glasses. Our determination is of necessity one of fact which must rest upon all the information contained *132 in the record bearing upon the future of the respective companies as of decedent's death. Snyder's Estate v. United States,285 F. 2d 857 (4th Cir. 1961). We will for this reason consider each company separately. 1. Engineering.
The sole evidence proferred by respondent pertaining to the value of the common stock of Engineering was the report and testimony of his expert, O'Farrell. As noted in our findings of fact O'Farrell selected eight companies considered by him to be comparable to Engineering and for each computed a ratio of stock price to book value and a ratio of average earnings to book value. He plotted the resulting points on a graph and, finding considerable variation, utilized the appropriate ratios of Stanley Aviation Corp. (Stanley) and Simmonds Precision Products, Inc. (Simmonds) in constructing a trend line upon which he located Engineering's 11.9 average earnings to book value ratio (as determined by him). This resulted in a 2.2 price to book value ratio for Engineering and a total stock price for Engineering of $9,142,000. The use of listed stock prices of comparable companies' valuations has received both judicial and legislative sanction. See section 2031(b), I.R.C. 1954, *133 Central Trust Company v. United States,305 F. 2d 393 (Ct. Cl. 1962). However, we find the above analysis to be inappropriate in the instant case. Respondent's expert found the eight companies employed in his analysis to be comparable in that they "were in the same general industry of supplying airplanes with products and/or services and all but three were reasonably close to Engineering in size as represented by annual sales." Petitioner contends that this definition of comparable is far too broad pointing to section 2031(b), which provides: Valuation of Unlisted Stock and Securities. -- In the case of stock and securities of a corporation the value of which, by reason of their not being listed on an exchange and by reason of the absence of sales thereof, cannot be determined with reference to bid and asked prices or with reference to sales prices, the value thereof shall be determined by taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange. [Emphasis added.] He urges that the legislative history of this subsection clearly indicates an intent *134 on the part of Congress to distinguish between comparable corporations and corporations engaged in the same or similar line of business, the latter class being much narrower in scope. Stripped to its essentials, the core of petitioner's position is that the underscored language contains an exhaustive definition of corporations that can be used for comparative purposes which petitioner interprets to mean essentially identical. We have examined the legislative history of the pertinent statutory language and find nothing supportive of petitioner's position. This language made its first appearance as part of section 811(k), I.R.C. 1939, 58 Stat. 70. When the provision emerged from the House Committee on Ways and Means, it contained the language "comparable corporations." H. Rept. No. 871, 78th Cong. 1st Sess. (1943), 1944 C.B. 901, 954. The Senate Committee on Finance, however, deemed the provision in its entirety to be inadvisable in that it might subsume other factors relevant to questions of valuation. S. Rept. No. 627, 78th Cong. 1st Sess., (1943), 1944 C.B. 973, 996. In conference the House receded with an amendment which is identical in all relevant respects to present section 2031(b) *135 stating that the purpose thereof was to clarify the status of such information as just one of many factors to be considered in valuing the stock of a closely held corporation. Conf. Rept. No. 1079, 78th Cong. 2d Sess. (1944), 1944 C.B. 1059, 1079. Nowhere in the legislative history can we find or deduce the notion that the words "comparable corporation" were deleted in favor of the words "corporations engaged in the same or similar line of business" to indicate a variation in the meanings of the respective terms. Hence, we find these terms to carry an identity of meaning and will henceforth use them interchangeably. Turning to the report of respondent's expert, it is clear that, although he found eight companies to be comparable to Engineering, only two were employed in his final analysis, those being Stanley and Simmonds. His valuation must, in the first instance, stand or fall on whether or not these two companies were, as of the decedent's death, comparable to Engineering. We also note that petitioner's definition is unduly restrictive, as it strips the inquiry into the valuation of closely held stock of the flexibility needed to make an informed judgment. Rare indeed would *136 be the corporation identical to that being valued and judicial sanction of petitioner's interpretation would render the portion of section 2031(b) at issue virtually meaningless. On the other hand, the fact that two companies are both part of the same general industry does not, as respondent's expert implies, make them comparable per se. Such a standard clearly ignores the interplay of the myriad of complex factors and features that must be accounted for in any meaningful comparison. Rather we think it imperative that the characteristics of the subject company and the purportedly comparable company relevant to the question of value be isolated and examined so that a significant comparison can be made. Those factors include the respective products, market, management, earnings, dividend paying capacity, book value, and position in the industry of each company. See Central Trust Company, supra.
After a careful consideration of the record we are convinced that Stanley and Simmonds are simply not comparable to Engineering. The former two companies are broad based companies that manufacture a wide range of products. Neither relies heavily on the commercial air transport market. *137 On the other hand, Engineering's success was almost entirely dependent upon its ability to market its G-series panel to customers in the commercial air transport industry. Furthermore, although the record shows Stanley to be relatively close to Engineering in sales and assets, Simmonds sales and assets were far in excess of those of Engineering. In addition neither of the "comparison companies" possessed a capital structure earmarked by the complexity of that of Engineering and apparently, unlike Engineering, were not dependent upon the abilities of one man. [18] Furthermore if one extrapolates the pertinent data actually used in the aforementioned analysis, one finds the following: (1) Slope of trend line = stock price/book value / average earnings/book value; (2) Slope of trend line = stock price / average earnings; (3) Slope of Engineering *138 = 2.2 /.119 = 18.49 The end result, therefore, is a price earnings ratio for Engineering of 18.49. Put another way the analysis of respondent's expert yields a capitalization ratio of 5.43 percent which we find to be unreasonably low in light of the attendant circumstances at the time of decedent's death. Finally, the above analysis contains what we believe to be one fundamental error irrespective of whether or not the appropriate companies were used for purposes of drawing a comparison. We have set forth section 2031(b) above. In further explication of that provision, section 20.2031-2(f), Estate Tax Regs. provides: (f) Where selling prices or bid and asked prices are unavailable. If the provisions of paragraphs (b), (c), and (d) of this section are inapplicable because actual sale prices and bona fide bid and asked prices are lacking, then the fair market value is to be determined by taking the following factors into consideration: (1) In the case of corporate or other bonds, the soundness of the security, the interest yield, the date of maturity, and other relevant factors; and (2) In the case of shares of stock, the company's net worth, prospective earning power and dividendpaying *139 capacity, and other relevant factors.
Some of the "other relevant factors" referred to in subparagraphs (1) and (2) of this paragraph are: the good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. In addition to the relevant factors described above, consideration shall also be given to nonoperating assets, including proceeds of life insurance policies payable to or for the benefit of the company, to the extent such nonoperating assets have not been taken into account in the determination of net worth, prospective earning power and dividend-earning capacity. Complete financial and other data upon which the valuation is based should be submitted with the return, including copies of reports of any examinations of the company made *140 by accountants, engineers, or any technical experts as of or near the applicable valuation date. These provisions, read in conjunction with the legislative history of section 2031(b), leave no room for doubt that a comparison with the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange is but one factor to be considered. It is readily apparent that it was the only factor taken into account by respondent's expert. [19]
In valuing the stock of Engineering based upon earnings, the opinions of the three *141 experts ranged from $450,000 to $500,000 per year. Petitioner's two experts then applied capitalization rates of 15 and 17.5 percent respectively to arrive at an indicated value for the company prior to the increase for the nonoperating assets. We believe that, based upon the trend of Engineering's earnings which we find significant, a prospective purchaser could anticipate future profits of $500,000. See Snyder's Estate,supra.We also believe that the risks attendant to Engineering's business merit a capitalization rate of 15 percent and, therefore, find the indicated value of Engineering based upon capitalization of earnings to be $3,333,333. Further, in allocating the indicated value, while we agree that the preferred stock should be valued at $3.15 per share based upon its liquidating preference, we think petitioner's experts erred in assigning to the nonvoting common stock a value in excess of its $3.00 per share liquidating value. Such excess was attributed to the dividend potential of the shares. However, since the controlling block of voting stock and the nonvoting shares would probably, upon sale, cease to be held by related interests, we think that the peculiar capital *142 structure of Engineering and the large dividend preference accorded the nonvoting common renders the future payment of dividends speculative. We hold that the premium for the dividend rights was erroneous and find the value of the nonvoting common to be $3.00 per share. Hence, based upon capitalization of earnings, we find the indicated value of the voting stock of Engineering, prior to addition for the value of nonoperating assets to be $2,920 per share arrived at as follows: Total value
$3,333,333
-Total value of preferred
at $3.15 per share
141,750
$3,191,583
-Total value of nonvoting
$ 272,544
common at $3.00 per
share
Total value of voting
2,919,039 or $2,920 per
common
share
In arriving at an indicated value based upon earnings both experts added the liquidating values of the nonoperation assets of Engineering to the value of the voting common stock. Neither, however, took into account the Piedmont policy on the life of decedent in accordance with which $39,675 was paid to Engineering. This was erroneous. Pursuant to section 30.2042-1(c)(6), Estate Tax Regs. [20] The Piedmont policy must be considered as a nonoperating asset of Engineering in valuing that company. [21] *144 Estate of John L. Huntsman,66 T.C. 861 (1976). *143 Based upon the adjusted book value of Engineering's nonoperating assets, we find an increase of $1,710 per share to the above value of the Engineering stock, $2,920 per share, to be appropriate. Hence, based upon earnings, we find the per share value of Engineering's common stock to be $4,630 per share. Petitioner's experts also valued Engineering on the book value method. In the main we agree with their analysis. However, they again failed to consider the Piedmont policy and in our opinion overvalued the nonvoting common stock in Engineering. Bearing this in mind, we find the value of the Engineering common stock based upon the book value method to be $4,080 per share arrived at as follows: Total value per petitioner's
$4,453,956
experts
-Total value of preferred
141,750
-Total value of nonvoting
272,544
common
Total value of voting common
$4,039,662 or $4,040
per share
Addition of $40 per share for
+ 40
life insurance
$4,080
In combining the two we think in the case of a going concern such as Engineering earnings value should be accorded a greater *145 weight than book value, Snyder's Estate,supra. Utilizing our best judgment we find the preliminary value of the Engineering voting common stock to be $4,400 per share. To this figure we find, in light of the fact that we are dealing with stock in a closely held corporation, and the fact that the potential class of purchasers for such stock is quite narrow, a 20 percent discount for non-marketability to be appropriate. Hence we conclude that at the date of decedent's death the value of the voting common stock of Engineering was $3,520 per share. 2. Electronics.
Respondent's sole evidence with respect to the value of the stock of Electronics was the testimony and report of his expert witness who again used the comparative method utilizing Simmonds and Stanley as the basis of his analysis. As noted in our findings of fact, Electronics was essentially a subcontractor for Enginering which was its sole customer. For the same reasons stated in our previous discussion of respondent's expert's analysis of Engineering, we find the companies used to be in no way comparable to Electronics and this analysis to be of little probative value. In valuing Electronics upon the basis of earnings, *146 the earnings projections of all three experts were relatively close in amount. We believe that earnings trend indicates $75,000 per year to be a reasonable forecast of the future earnings, and that in light of the nature of Electronics' business we are justified in applying thereto a capitalization rate of 20 percent. In allocating the indicated value of $375,000 between the voting and nonvoting common, the situation is somewhat unlike that presented with respect to Engineering since a prospective buyer could more easily purchase both blocks of stock (one owner) thereby making the declaration of dividends more likely. For this reason we agree with petitioner's experts both of whom valued the nonvoting stock at $5.00 per share or a total of $83,500. Further, to the remaining equity allocable to the voting common must be added the net proceeds realizable from Electronics' nonoperating assets. On examination of the records of Electronics we find this amount to be $110,000. Thus we conclude the indicated value of the Electronics to be $5.00 per share for the nonvoting common and $402.00 per share for the voting common. On the book value method both of petitioner's experts valued *147 the voting common stock at $597.00 per share, a figure with which we agree. Since Electronics was an ongoing business, we attribute greater weight to the earnings value and find the value of the voting shares to be $450.00 per share prior to any discount for non-marketability. Giving particular weight to the testimony of the experts at trial we think we are justified in applying a 20 percent discount for non-marketability. Thus we hold the value of the Electronics stock at issue to be $360.00 per share. We find it necessary to add one final note. Petitioner argues that the stock in both Electronics and Engineering should be discounted for the loss of the decedent's services. We agree and have taken into account this factor which an informed purchaser would be presumed to know in arriving at the aforementioned figures pertaining to the projected earnings and rates of capitalization. 3. Atlantic Gear.
With respect to the value of the stock of Atlantic Gear, the parties are in agreement on all but two points. On the federal estate tax return the per-share value was calculated to be $567.00 by averaging Atlantic Gear's earnings for the period 1966 through 1969 and applying an earnings *148 multiplier of 7. Respondent also used a multiplier of 7 but eliminated 1966, the year in which Atlantic Gear sustained a loss of $847 from his computation of average earnings in arriving at a value of $77.00 per share. We believe respondent was correct in eliminating the year 1966 from his computation. Past earnings are significant only insofar as they are useful in forecasting future earnings. Central Trust Company,supra.The earnings for any year which represent a nonrecurring windfall or loss should be eliminated. The year 1966, being Atlantic Gear's first full year of operation, obviously provides no true picture of future earnings and respondent's elimination thereof was proper. The second point of contention is the net asset value of Atlantic Gear. The listed book value of the stockholders' equity as of decedent's death was $30,879. Relying solely on his own testimony, petitioner argues that the true net value of certain equipment was overstated and that the true net value of Atlantic Gear was $16,714 or $16.71 per share. Petitioner in no way qualified as an expert in valuation and, after listening to his testimony in this regard, we are of the opinion that it is insufficient *149 to establish the correct net value of Atlantic Gear. However we do agree with petitioner that book value should have been accorded some weight in valuing the company and find the value of common stock of Atlantic Gear to have been $740.00 per share as of decedent's death. In view of the foregoing, Decision will be entered under Rule 155. Footnotes
1. Respondent would allow additional credit for state inheritance tax based upon the increase in value of the estate if payment is substantiated.↩
2. In May, 1960 Engineering had authorized 200 shares of capital stock, divided into 100 shares of voting common stock and 100 shares of preferred stock. In 1960, its authorized capital stock was recapitalized to provide for 1,000 shares of voting common, 100,000 shares of novoting common, and 100,000 shares of preferred stock. ↩
3. The Victor P. Clarke Foundation, Incorporated was a charitable foundation organized under the laws of the State of Florida in 1960. It was a nonprofit corporation under Florida law. ↩
4. The Engineering Employees Pension Trust was a qualified trust under secs. 401 and 501, I.R.C. 1954↩.
5. During these years the officers of Engineering were: Period
Position
Individual
1964-March 1967
President and General Manager
Decedent
March 13, 1967-
President
Petitioner
May 1969
1964-May, 1969
Vice President
Walter L. Dixon
1964-March, 1967
Treasurer and Assistant Secy.
Petitioner
March 13, 1967-
Assistant Secretary
Blanche P. Olin
May, 1969
March 13, 1967-
Treasurer, Chairman of the
Decedent
May, 1969
Board, and Chief Executive
Officer
1964-May, 1969
Secretary
Charlotte H. Clarke
1964-May, 1969
Auditor
C. Palmer Parker
The directors during this period were decedent, Victor E. Clarke, Charlotte H. Clarke, and Walter L. Dixon.↩
*. The numbers shown at the upper right represent percentage of total sales of the product line for the year in question. ↩
6. ABC parts were items such as spare parts sold to customers for their use in the repair and maintenance of the products of Engineering. ↩
7. The category "G 825 Etc." comprises automatic tape players designed for installation in commercial aircraft. At the request of one airline, Engineering began production of these tape players in 1960. By 1968 airlines began utilizing multichannel stereo systems manufactured by other firms. Engineering did not make such a product and by the time of decedent's demise orders for its tape players had declined substantially. 8. Nav. warning systems were eectronic devices that monitored navigation systems. ↩
9. G-Series amplifiers included audio speakers and public address and interphone amplifiers.↩
10. The backlog of the Avionics Division of Bendix also declined between June, 1968 and May 2, 1969.↩
11. Viclarke, Inc. owned vacant lots valued as of May 2, 1969, at $25,750.↩
12. One such unusual characterisitic which in McCune's opinion would reduce its marketability and the number of prospective purchasers was ownership of various parcels of real estate, including a ranch and other properties not committed to the manufacturing business and the risks attendant thereto.↩
13. McCune assigned a value of $4.50 per share to the nonvoting common stock. He took into account the $3.00 liquidating value of such stock. However, because of the favorable dividend rights of the nonvoting common, McCune was of the opinion that such shares had a value in excess of their liquidating value and attributed an additional $1.50 to each such share.
*. McCune rounded this figure to $3,900.↩
14. Moore believed a rate between 15 and 20 percent was reasonable in light of the risks of the business.↩
15. In actually plotting the trend lines O'Farrell utilized only the ratios for Simmonds Precision Products, Inc. and Stanley Aviation Company.↩
16. O'Farrell found the assets and liabilities of Engineering as of December 31, 1968 to be $5,904,902 and $1,749,458, respectively.
17. No premium for voting control was added to this figure.↩
18. We recognize that all eight companies could have been employed by respondent in the computation of an average price-earnings ratio which could have been applied to Engineering's earnings. However, for similar reasons we believe that none of the other six companies is sufficiently comparable to Engineering to give credence to such an analysis.↩
19. Respondent's expert did note in his report that the complex capital structure of Engineering would necessitate a liquidation.Petitioner, on brief, argues extensively that such a liquidation could not be readily achieved under Florida law, and that it is inappropriate to consider the effect of a liquidation since Engineering was a going concern at the time of death. However, despite the lip service given to a prospective liquidation by respondent's expert, it in no way affected his actual analysis. We, therefore, find it unnecessary to consider petitioner's contention that Florida law would preclude such an event.↩
20. (6) In the case of economic benefits of a life insurance policy on the decedent's life that are reserved to a corporation of which the decedent is the sole or controlling stockholder, the corporation's incidents of ownership will not be attributed to the decedent through his stock ownership to the extent the proceeds of the policy are payable to the corporation. Any proceeds payable to a third party for a valid business purpose, such as in satisfaction of a business debt of the corporation, so that the net worth of the corporation is increased by the amount of such proceeds, shall be deemed to be payable to the corporation for purposes of the preceding sentence. See sec. 20.2031-2(f)↩ for a rule providing that the proceeds of certain life insurance policies shall be considered in determining the value of the decedent's stock * * *. 21. In this connection we note that respondent initially determined that this policy was includible in decedent's gross estate but later altered his position asserting that such policy was an asset of Engineering. Petitioner, on brief, mistakenly asserted that respondent had conceded this issue. However, in light of the stipulation of the parties that Engineering owned the policy and was the beneficiary thereof we do not believe petitioner was in any way prejudiced by the shift in respondent's position.