FREDERIK G. H. MEIJER AND LENA E. S. MEIJER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Meijer v. Commissioner
Docket Nos. 3216-75, 3890-76.[1]
United States Tax Court
T.C. Memo 1979-344; 1979 Tax Ct. Memo LEXIS 176; 38 T.C.M. (CCH) 1347; T.C.M. (RIA) 79344; August 30, 1979, Filed Stephen C. Bransdorfer,John W. McNeil, and Arthur R. Snell, for the petitioners. Thomas R. Ascher, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioners' Federal gift tax liabilities for each of the following calendar quarters: Frederik
Lena E. S.
G. H. Meijer
Meijer
Totals
Quarter ended
Dec. 31, 1971
(gift of 11-11-71)
$23,837.98
$22,740.48
$46,578.46
Quarter ended
March 31, 1972
(gift of 1-6-72)
$18,862.00
$18,880.00
$37,742.00
Quarter ended
Dec. 31, 1972
(gift of 12-29-72)
$322,314.57
$321,913.74
$644,228.31
Increase in
deficiencies
claimed for
quarter ended
Dec. 31, 1972 [2]
$300,299.31
$300,000.01
$600,299.32
$665,313.86
$663,534.23
$1,328,848.09
*177 Petitioners assert overpayments of gift taxes for the following calendar quarters and seek a claim for refund in the following amounts: Frederik
Lena
G. H. Meijer
E. S. Meijer
Totals
Quarter ended
Dec. 31, 1971
$3,463.03
$4,475.52
$7,938.55
Quarter ended
March 31, 1972
$1,446.49
$1,413.00
$2,859.49
$4,909.52
$5,888.52
$10,798.04
To resolve the differences between petitioners and respondent, we must determine the fair market value of 92,400 shares of Meijer, Inc. common stock which petitioners transferred for the benefit of their three sons. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Frederik G. H. (hereinafter petitioner) and Lena E. S. Meijer, husband and wife, resided in Grand Rapids, Michigan, when they filed their returns with the Office of the Internal Revenue Service at Cincinnati, Ohio, and when they filed their petition in this case. Lena E. S. Meijer is a party solely by *178 virtue of having agreed to join in the gifts of Meijer, Inc. common stock and to file gift tax returns with respect to those gifts. In 1947, Meijer, Inc. (hereinafter Meijer), a closely held family corporation, was incorporated in Michigan to operate a three store grocery business. By the end of 1961, the business had expanded to sixteen groceries which were operated under the name of Meijer Super Markets, Inc. In 1961, Meijer decided to broaden its merchandising operation from a grocery business to a diversified self-service department store business and opened three self-service department stores which sold both food and general merchandise. These stores, as well as those which were subsequently converted or newly opened, were operated under the name of Meijer Thrifty Acres. At the beginning of 1972, the corporation was operating 10 groceries and 13 Thrifty Acres stores in the western Michigan area. Meijer has two wholly owned subsidiaries, Meijer Wholesale, Inc., and Wholesale Merchandisers, Inc., which provide it with wholesale services with respect to food and general merchandise. In addition, Meijer owns 75 percent of the stock of Thrifty Acres Pharmacy, Inc., which operates *179 pharmacies in all but one of the Thrifty Acres stores. The operation of all of these subsidiaries is fully reflected in all of Meijer's financial statements. Petitioner was president, chief executive officer, majority stockholder, and a member of the board of directors of Meijer at the time he made gifts of Meijer stock. He was the originator of and promoter for Meijer's unique merchandising concept and has been the dominant factor in the growth and success of the corporation. In 1967, petitioner personally guaranteed payment of bank loans by pledging all of his Meijer stock as security so that Meijer had sufficient operating capital. In 1972, Meijer made several major commitments to its growth and expansion. It ventured into the highly competitive area of eastern Michigan by opening stores in the Ypsilanti-Ann Arbor area in February 1972, and in the Flint area in November 1972. During this time, the corporation had a second store under construction in the Flint area which opened in March 1973, and a store in the Jackson area which opened in the fall of 1973. These two new stores were projected to operate at losses for up to a one year period and, at the end of 1973, they *180 were operating at losses. Meijer's expansion also included the construction of an office addition, commenced at a cost estimated at $4,000,000. Since Meijer's existing distribution center was no longer large enough to handle food and general merchandise, Meijer arranged financing for the construction of a new distribution center in the Lansing, Michigan, area in the summer of 1972. Financing commitments of $9,900,000 were obtained to be used to cover the construction costs of the new building and to purchase sophisticated computerized automated order-filling equipment which had been contracted to be purchased at an agreed price in excess of $2,700,000. Further financing of approximately $3,000,000 was required by the end of December 1972 to construct and equip the distribution center as well as a maintenance building to service the corporation's trucks and trailers. Finally, by the end of 1972 Meijer was also developing plans to supplement the existing Grand Rapids distribution center with an additional warehouse building of 150,000 to 220,000 square feet. Meijer does not own any of its stores, but leases most of them from affiliated corporations which are owned by the same *181 stockholders who own Meijer. In view of its rapid expansion Meijer maintained a program, through its real estate affiliates, of acquiring future building sites in the suburban Detroit area. Total down payments for six to eight sites were estimated in the range of $1,500,000 to $2,000,000. In addition to annual principal payments of between $1,000,000 and $2,000,000, carrying costs for the sites were projected to require $750,000 to $1,000,000 annually. These sites were intended for new stores over a period of five to eight years, depending upon the success of the penetration in the Detroit market.
The short-term effect of this investment in sites for future stores would be a reduction in earnings because the financing would adversely affect Meijer's cash flow. The new office and warehouse facilities Meijer planned to construct at the end of 1972 to meet its future needs would also result in a substantial increase in overhead expense without any immediate increase in earnings. The corporation's working capital has always been provided through heavy bank financing and the real estate which it leases from affiliated corporations has been financed through substantial loans from insurance *182 companies based upon Meijer's credit. Moreover, during 1971 and 1972, Meijer had a higher debt to equity ratio and a lower working capital ratio than the average ratios of corporations engaged in the business of retail food and general merchandise self-service discount stores as reported on a nationwide basis. On November 11, 1971, petitioner gave 7,680 shares of Meijer common stock with 2,560 shares transferred outright to his son, Hendrick, and 2,560 shares transferred to trusts for the benefit of each of his sons, Douglas and Mark. Each gift represented.64 percent of the total outstanding shares of Meijer common stock. In quarterly gift tax returns filed on February 15, 1972, petitioner valued the stock at $48.68 per share for a total gift of $373,862.40 and paid a gift tax of $53,106.63 on that amount. On January 6, 1972, petitioner gave 4,620 shares of Meijer common stock with 1,540 shares transferred outright to Hendrick and 1,540 shares transferred to trusts for the benefit of Douglas and Mark. Each gift represented.385 percent of the total outstanding shares of Meijer common stock. In quarterly gift tax returns filed on May 15, 1972, petitioner valued the stock at *183 $48.68 per share for a total gift of $224,901 and paid a gift tax of $46,627 on that amount. On December 29, 1972, petitioner gave 80,100 shares of Meijer common stock with 26,700 shares transferred into separate trusts for each of his three sons. Each gift represented 6.675 percent of the total outstanding shares of Meijer common stock. In quarterly gift tax returns filed on February 16, 1973, petitioner valued the stock at $40 per share for a total gift of $3,204,000 and paid a gift tax of $932,268 on that amount. On December 29, 1972, petitioner's wife, Lena E. S. Meijer, who was both a Meijer stockholder and a member of its board of directors, entered into a stock redemption agreement with Meijer. Her stock was redeemed to pay the gift taxes on the Meijer stock petitioner transferred to their sons on the same date. In order to establish the fair market value of the stock for purposes of both the redemption of Lena E. S. Meijer's shares and the shares petitioner transferred to his sons, a valuation expert of closely held stock who had no prior contact with the parties was retained. The expert valued the stock at $40 per share on the date of the redemption and the gifts.
*184 At the time of the November 11, 1971, and January 6, 1972, gifts Meijer had 400,000 issued and outstanding shares of $1 par value common stock. [3] Due to the redemption of Lena E. S. Meijer's 22,774 shares of Meijer stock, however, there were only 377,226 shares of issued and outstanding common stock as of the date of the December 29, 1972 gift.[4]
Over the years Meijer had established a solid earnings record, but did not pay dividends during the five years preceding the gifts. [5] Meijer's net income per share for each of the six fiscal years preceding the December 29, 1972, gifts was as follows: *185 [SEE TABLE IN ORIGINAL]
Meijer's five-year average earnings prior to the November 1971 and January 1972 gifts were $6.55 per share. Prior to the December 1972 gifts, Meijerhs five-year average earnings were $8 per share. Meijer's consolidated balance sheets from fiscal years ending February 3, 1968 through 1971, summarize the corporation's growth and prosperity. Summaries of Consolidated Balance Sheets of Meijer, Inc. and Subsidiaries [SEE TABLES IN ORIGINAL] At the end of these six fiscal years, five of which ended prior to the November 1971 and January 1972 gifts and six of which ended prior to the December 1972 gifts, the book value of Meijer common stock on a par share basis had been as follows: [SEE TABLE IN ORIGINAL] Although Meijer's earnings continued to increase, the grocery business became extremely competitive in 1972 when A & P (The Great Atlantic and Pacific Tea Company) instituted its WEO ("Where Economy Originates") price-cutting campaign and Kroger embarked on a similar program. Due to these competitive conditions, Meijer had to reduce further its already low food prices. Moreover, government-imposed Phase II Wage and Price controls, which froze *186 retail food prices but allowed farm prices to rise, had the potential effect of squeezing all food retailers' profit margins. The Phase II controls also affected non-food sales by restricting increases in profit margins. Finally, in the general merchandising area, Meijer and its other competitors had stiff competition from the large K-Mart chain. As a result of these conditions, respondent's expert found that the market prices for the common stocks of corporations comparable to Meijer declined 23.9 percent from January 6, 1972 to December 29, 1972. During the same period, market prices for the common stocks of the comparable corporations used by petitioner's expert declined an average of 24.1 percent. Nonetheless, in 1972 Meijer was quite profitable and was approached by several investment bankers interested in underwriting the sale of Meijer stock on a public stock exchange. Prior to 1972, Meijer also received numerous inquiries from parties interested in acquiring it. Petitioner's and respondent's expert witnesses valued the gifts of shares of Meijer stock as follows: Gift
Petitioner
Respondent
November 11, 1971
$43.50
$72.00
January 6, 1972
$46.00
$78.00
December 29, 1972
$38.00-$40.00
$78.00
*187 ULTIMATE FINDINGS OF FACT The value of Meijer stock on each of the three dates petitioner transferred it to his sons was as follows: November 11, 1971
$49.00
January 6, 1972
$52.00
December 29, 1972
$47.00
OPINION We must determine the value of 92,400 shares of Meijer stock transferred by petitioner to his three sons both outright and in trusts on the following dates: November 11, 1971, January 6, 1972, and December 29, 1972. Section 2512(a)[6] provides: "If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift." In a case such as this where there is no public market for the stock at the date of the gift, the regulations under this section provide: (f) * * * the fair market value is to be determined by taking the following factors into consideration. * * * (2) In the case of shares of stock, the company's net worth, prospective earning power and dividend paying capacity, and other relevant factors. Some of *188 the "other relevant factors" referred to in * * * [subparagraph 2] of this paragraph are: the goodwill of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. * * * Section 25.2512-2(f), Gift Tax Regs.As noted in Hamm v. Commissioner,325 F. 2d 934, 938 (8th Cir. 1963), affirming a Memorandum Opinion of this Court: Valuation of stock for tax purposes is a matter of "pure fact." * * * * * * One might say in general that these factors are the things that a buyer and a seller would wish to know and consider before reaching a conclusion as to fair value * * *. In determining the value of the Meijer stock, we have studied *189 the entire record including the stipulation of facts, all the documentary evidence, and the complete testimony of all witnesses. Some of the factors that have shaped our conclusions are the historical development and growth of the corporation, its liquidity, its underlying assets, the potential growth and development of the underlying assets, the management policies of the corporation, the number of shareholders and the number of shares of stock outstanding, the historical earnings and projected future earnings, the dividend payment policies, comparable corporations and the market values of their stock, as well as other factors which the parties believed were significant in valuing Meijer's stock. We have given special attention to the testimony and reports of the three expert witnesses, each of whom approached the valuation of closely held stock differently. Petitioner's first expert, Sigurd R. Wendin, has an extensive background in the valuation of closely held stock, having served as an expert witness for both taxpayers and the government.His analysis was thorough. He interviewed the corporation's management, analyzed the corporation's financial statements for the five fiscal *190 years prior to December 29, 1972, and considered the general condition of the discount merchandising industry and the market for its stock. In his opinion the Meijer stock was worth $43.50, $46.00 and $40.00 per share on November 11, 1971, January 6, 1972, and December 29, 1972, respectively. Wendin gave Meijer's management an excellent rating, but considered petitioner a key man in the corporation and therefore, thought the corporation's dependence on him had a negative effect on the value of Meijer stock. Moreover, since Meijer's management was not responsible to public shareholders, Wendin observed that Meijer's management can and probably did take larger expansion risks with less capital than does the average public corporation in Meijer's business. Although Wendin was impressed with Meijer's earnings record, he concluded that other significant factors, such as nonpayment of dividends and lack of marketability, substantially decreased the value of the stock. In his report he noted that purchasing Meijer stock would be highly speculative because no dividends had been paid and none were expected in the future due to the corporation's expansion policy requiring the full utilization *191 of its cash resources. Thus, an investor would have to rely on appreciation of the stock rather than on current dividend return which posed substantial risks given Meijer's highly leveraged condition. Furthermore, since the gifts were minority interests, Wendin noted that a stockholder would be powerless to change Meijer's dividend paying policies and may not even recover his investment because Meijer stock was not publicly traded. Although there are no publicly traded corporations exactly like Meijer, Wendin used as comparatives a number of corporations which have similar business activities and are exposed to the same market risks. By the end of both 1971 and 1972, he found that stocks of discount retailers were in a declining trend due to uncertainties concerning the money markets, the Phase I and II Wage and Price Controls on earnings and profit margins, and the stiff competition due to expansion programs by nearly every corporation in the business. Moreover, Meijer's leveraging ratio and ratio of working capital to book value were much less than those of the comparable corporations Wendin used. Petitioner's second expert, Richard S. Trenkman, vice president of Kidder, *192 Peabody, and Co., Inc., also had an impressive background for qualification as an expert at valuing closely held stock. His expert opinion was limited to the December 29, 1972, gifts of stock which he valued $38at per share. He used the "going concern" approach which focuses on a corporation's ability to produce dividends with emphasis on the source of future dividends. Additional factors he considered were Meijer's financial condition, need for capital, growth prospects, stock marketability, and the fact that the gifts of stock were minority interests.
Like Wendin, Trenkman considered Meijer's operating performance during the five years prior to the December 29, 1972, gifts of stock because Meijer was an established business in its respective markets and historical information beyond five years becomes substantially less relevant. Although Meijer was not among the comparable corporations selected by Trenkman which reported a drop in earnings per share over the relevant five-year period, he did note that Meijer had one of the highest percentages of total capitalization represented by debt and leases. Unlike Wendin, Trenkman downplayed Meijer's nonpayment of dividends on its common *193 stock because the dividends paid by comparable corporations were relatively low. Moreover, in his view, dividend payment is not a significant factor in valuing closely held common stock. In valuing the stock, Trenkman treated Meijer as a general merchandise discount retailer and determined a market price for the stock as if Meijer was a publicly held corporation. He then discounted this market price recognizing that the stock would have to be sold privately and that the gifts constituted only minority interests. He further discounted the stock for the costs which would be incurred if the Meijer stock was registered and marketed publicly. His hypothetical market price was finally discounted in consideration for the declining trend of stock values on the poublic and private markets at the end of 1972 and its potential effect on the value of Meijer stock if it had been sold on December 29, 1972. Morris M. Green, Jr., respondent's expert, presented the least thorough analysis of the three experts, relying primarily on the corporation's earnings over a two-year period preceding the valuation dates. Given Meijer's profitability, he did not view the nonpayment of dividends as a *194 serious negative factor because he thought it was a wise policy for management to "plow back earnings" into the business. Once capitalizing Meijer's earnings, Green discounted the stock for its lack of marketability. On this basis he concluded that the value of Meijer stock per share was $72 on November 11, 1971, § 78 on January 6, 1972, and $78 on December 29, 1972. Although we found Green's report of some assistance, his testimony, like his report, was seriously flawed because he determined the stock's value on the basis of Meijer's earnings history for only two years preceding the gifts. We find this two-year period inadequate for a clear reflection of a company's current and future prospects. Green also placed an undue emphasis on Meijer's profitability and earnings while neglecting to consider sufficiently such factors as Meijer's highly leveraged condition, petitioner's importance as a key man in the corporation, the competitiveness of the industry, and the decline in market value of the stock of comparable corporations between January 6, 1972 and December 29, 1972. He also underestimated the difficulty of selling minority blocks of closely held stock for which there *195 is no ready market. Finally, Green failed to make an inquiry concerning Meijer's operations and management. The valuation reports prepared by Wendin, petitioner's first expert, were defective because too much emphasis was placed on Meijer's nonpayment of dividends and on the restrictions on the payment of dividends imposed by Meijer's lender. Generally, the payment of dividends is an important factor in the valuation of stock. With respect to stock of a closely held family corporation, however, dividend payment capacity is more indicative of value because dividend payments by such corporations are often more related to the needs of the shareholder than to the corporation's ability to pay. Moreover, Meijer would not have generated the interest of investment banking firms if the corporation had not enjoyed substantial business vitality and public investment potential. Certain aspects of the valuation by Trenkman, petitioner's second expert, as presented in his testimony and report, were both illogical and redundant. After determining a hypothetical market price for Meijer stock, he discounted that price on the grounds that the stock could only be sold through private placement *196 before further discounting it for underwriting and marketing expenses. These discounts not only overlap but appear to be exaggerated. Although a minority block of Meijer stock would be significantly discounted if privately placed, Trenkman seemed to overlook that Meijer was a profitable company and that its growth and expansion made its stock by no means an unattractive investment. Petitioner testified that since there was a simultaneous redemption of his wife's stock at the time of the December 29, 1972, figt and a valuation of the stock on that date at $40 per share for purposes of both the redemption and the figt, this valuation should be treated as the fair market value of the stock at the time of the third gift. Respondent argues that a lower valuation was beneficial to petitioners because the gift tax attributable to a higher valuation would increase at a progressively quicker rate than would the redemption proceeds at a higher valuation.Accordingly, Lena E. S. Meijer could never have hoped to effect an increase in her personal assets if the stock had had a higher valuation since she and her husband could only anticipate a greater amount of funds being needed for the payment *197 of gift taxes. In determining the value of unlisted stocks, actual sales made in reasonable amounts at arm's length in the normal course of business within a reasonable time before or after the valuation are the best criteria of market value. Fitt's Estate v. Commissioner,237 F. 2d 729 (8th Cir. 1956). The burden of proof, however, is on the petitioner to demonstrate that the sales relied upon are arm's length transactions in the normal course of business. Fitt's Estate v. Commissioner,supra.We find that petitioner has not met this burden. The sale of a significant interest in a closely held corporation, the sole purpose of which is t pay gift tax on shares simultaneously gifted to the common objects of the donor's and seller's bounty, does not in itself represent an arm's length transaction in the normal course of business. The valuation was made for the benefit of three related parties, Meijer, Inc., Frederick .G. Meijer, d Lena E. S. Meijer. Their interests, if not one and the same, are so interrelated that such valuation followed by a redemption *198 cannot be considered at arm's length in the normal course of business without some evidence proving otherwise. Petitioner failed to submit such evidence. In testifying, petitioner seemed to exaggerate the effect of the stiff competition Meijer faced. Although standing in the industry is a factor to consider when valuing stock, Meijer's earnings indicate that it was able to compete at the time of the gifts. Moreover, if stiff competition was such a serious threat to Meijer's vitality, it seems unlikely that its management would have initiated such an ambitious expansion program and, more importantly, that financing would have been available to carry out this program. On this record, we conclude that the value of one share of Meijer stock on November 11, 1971, January 6, 1972, and December 29, 1972, was $49.00, $52.00, and $47.00, respectively. Since each valuation turns on its own set of facts, discussion of the various cases cited by the parties will not be helpful. Messing v. Commissioner, 48 T.C. 502, 512 (1967). Instead, we have carefully examined each expert's reasoning and methodology and have based our valuation upon a thorough study of the record. *199 We have considered petitioner's other arguments and find them unpersuasive. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. These cases were consolidated at trial for purposes of trial, briefing, and opinion.↩
2. Respondent filed a motion and was granted leave to amend his answer prior to trial at which time he increased the deficiencies for the fourth quarter of the calendar year ending on December 31, 1972.↩
3. At the time of the November 11, 1971, and January 6, 1972, gifts Meijer also had authorized and outstanding 500 shares of 4 percent cumulative perferred stock having a par value of $100 per share. ↩
4. At the time of the December 29, 1972, gifts Meijer also had authorized and outstanding 410 shares of 4 percent cumulative preferred stock having a par value of $100 per share. Lena E. S. Meijer's 90 shares of preferred stock were redeemed simultaneously with her common shares.↩
5. By the terms of an agreement with Michigan National Bank, Meijer, Inc., was forbidden from paying dividends of any kind on any of its stock at the time of these gifts.↩
6. Statutory references are to the Internal Revenue Code of 1954, as amended.↩