CECILIA A. TALLICHET, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent DAVID C. TALLICHET, JR., Petitioner v. Commissioner OF INTERNAL REVENUE, Respondent
Tallichet v. Commissioner
Docket Nos. 3783-72, 3785-72.
United States Tax Court
T.C. Memo 1974-255; 1974 Tax Ct. Memo LEXIS 71; 33 T.C.M. (CCH) 1133; T.C.M. (RIA) 74255; September 23, 1974, Filed. George Norman Rasmussen, for the petitioners. Stephen B. Zorick, Jr., for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: In these consolidated cases, respondent has determined deficiencies in gift tax for 1968 in the amounts of $24,740 in docket No. 3783-72 and $24,740 in docket No. 3785-72.The sole issue for our decision is the value of certain shares of closely-held stock which David and Cecilia Tallichet gave their minor children in August and September 1968. FINDINGS OF FACT Some of the facts have been stipulated and are so found. David and Cecilia Tallichet (petitioners) are husband and wife who resided in Long Beach, California, at the time the petitions were filed. Petitioners' gift tax returns for the calendar year 1968 were filed with the district *72 director of internal revenue, Los Angeles, California.
On August 1, 1968, petitioners each gave 500 shares of $1 par value common stock of Specialty Restaurants Corporation (Specialty) to each of their following minor children: Catherine Ann, William Robert, and John David Tallichet. On September 26, 1968, petitioners each gave 10,000 shares of $1 par value common stock of Specialty to their minor child, James Lee Tallichet. Thus, the petitioners' total gifts of Specialty common stock to their minor children in 1968 was 23,000 shares. Specialty was incorporated under California law in April 1968. Throughout 1968 David Tallichet (Tallichet) and his family controlled Specialty. Specialty's primary business in 1968 was management of 11 restaurants with popular-priced menus and the operation of two small shopping "villages." The oldest restaurant managed by Specialty was the first restaurant founded by Tallichet and was opened in 1958. Throughout the next 10 years, Tallichet's restaurant business increased and grew successful. His second restaurant was opened in 1961. Three more were founded in 1962. One was organized in 1964; two were established in 1965, one in 1967 and two *73 in 1968. Also, during 1968 Specialty had two restaurants under construction and one being designed. Prior to July 24, 1968, these restaurants and shopping villages were 13 separate business entities, each organized as a corporation. Tallichet was the founder, chief executive officer and principal shareholder of each. On July 24, 1968, the 13 corporations and their subsidiaries were reorganized as subsidiaries under the single corporate umbrella of Specialty; the shareholders exchanged all of their voting stock in these corporations for all the issued and outstanding voting stock of Specialty, which consisted of 1,500,000 shares of $1 par value common stock. Specialty acquired four other corporations on July 24, 1968, for cash. On a consolidated basis, the financial performance of the businesses that were reorganized on July 24, 1968, as subsidiaries of Specialty was as follows: Year
Gross Receipts
Gross Income
Net Income
Earnings Per Share 1966
$ 8,734,201
$5,905,410
$ 826,192
.56
1967
9,226,787
6,290,617
897,120
.60
1968
11,864,120
8,152,000
1,076,469
.72
Throughout 1968, Specialty paid no dividends and represented *74 to prospective shareholders that it did not intend to pay cash dividends in the foreseeable future. All eleven of Specialty's restaurants were operated on leased premises during 1968. Ten of the leases were for terms of years londer than the useful life of the buildings, but were subject to rent renegotiations every five years. One lease expires in 1975, but Specialty has an option to renew it for a 10-year term. During 1968 there was no substantial variation among the restaurants in the method of operation, size or working staff. The menu, with local variations, featured selected cuts of meat and lobster and a selection of fine wines and liquors. Specialty employed approximately 650 employees as of October 1, 1968. There was a weakness in Specialty's management because of a lack of experienced subordinate authority. The success of Specialty and its subsidiaries was largely due to Tallichet's personal direction and guidance. If Tallichet, whose hobby was flying a World War II airplane, had died, the public offering would not have occurred. Prior to October 24, 1968, no public market existed for Specialty's stock, however the public markets throughout 1968 were generally *75 receptive to restaurant and food service stocks. On July 26, 1968, Specialty filed a Form S-1 registration statement with the Securities and Exchange Commission under the Securities Act of 1933 in order to register for public offering 315,101 shares, or 21 percent, of Specialty's issued and outstanding 1,500,000 shares of common stock. Solely for the purpose of determining the registration fee, the proposed maximum offering price per share was set at $16. Tallichet, who was one of the principal selling shareholders in this secondary offering, offered for public sale 15,101 shares of Specialty common stock. Dean Witter & Co. (Dean Witter), a member of the New York Stock Exchange, acted as the managing underwriter and sales agent for the public offering. Within 10 days after the registration statement had been filed Dean Witter had contacted other potential underwriters and had received responses favorable to the offering two to three weeks later. Tallichet was aware of this favorable response. Forty-three brokerage firms participated as underwriters. The number of shares each underwriter would hold for resale was not agreed upon until shortly before October 24, 1968, the effective *76 date of the registration statement. The selling shareholders were unwilling to proceed with the public offering if the offering price were less than 15 times earnings, or $10.80 per share. On October 24, 1968, 310,101 shares of Specialty common stock were offered for sale to the public at a price of $17.50 per share.The offering price was determined on the afternoon of October 23, 1968. Two years prior to the public offering of Specialty stock, two shareholders each sold a five percent interest in one of Tallichet's eight restaurant corporations for five times the corporation's earnings. None of the stock given by petitioners to their minor children was registered for public offering with the Securities and Exchange Commission. Petitioners consciously made their gifts at a time when the public offering was forthcoming. Petitioners valued the Specialty stock given to their minor children at $7.50 per share on their gift tax returns for 1968. By statutory notice of deficiency, respondent valued the stock at $17.50 per share, but at trial respondent conceded that the value of the stock did not exceed $13.25 per share. As an ultimate finding of fact, we find the value of the *77 Specialty stock given by petitioners to their minor children on August 1 and September 26, 1968, to be $12 per share. OPINION The sole issue before the Court is the value (for purposes of section 2512) [1] of petitioners' gifts of Specialty common stock to their minor children on August 1, 1968, and September 26, 1968. Each petitioner gave 500 shares of Specialty stock to each of three of their minor children on August 1, 1968, and each gave 10,000 shares of Specialty stock to a fourth minor child on September 26, 1968. This always nettlesome valuation issue is purely a question of fact: given a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of relevant facts, what is the price for which the Specialty stock would have changed hands on the dates of the gifts? Sec. 25.2512-1, Gift Tax Regs.; White Farm Equipment Co., 61 T.C. 189, 207 (1973), on appeal (C.A. 3, and C.A. 7, March 28, 1974). *78 It is our opinion that petitioners have carried their burden of proof regarding the correctness of respondent's determination of deficiency. Rule 142, Tax Court Rules of Practice and Procedure. Nevertheless, the facts present in the record before us establish that the fair market value of the stock constituting the gifts in this case was $12 per share. Respondent advances two theories of valuation to support his determination that the fair market value of the Specialty stock was $13.25 per share on the dates of the gifts. First, by statistical method, respondent constructs a hypothetical price-earnings ratio for Specialty stock as of the dates of the gifts, multiples the hypothetical ratio times Specialty's fiscal 1968 earnings per share, and then applies a discount for lack of marketability. Furthermore, respondent argues that the stock constituting the gifts could have been registered for public offering by amending the registration statement filed on July 26, 1968, and therefore, that the public offering price of $17.50 per share on October 24, 1968, less a discount for lack of marketability establishes the value of the stock given to petitioners' children at $13.25 per share.
*79 Respondent's first theory of valuing Specialty stock involved devising a statistical analysis relating the selling prices to the past earnings and dividends performance of four companies "in the same industry category" as Specialty and whose stock was publicly traded. This analysis purported to determine what the price-earnings ratio of Specialty stock should have been were to publicly traded on the dates of the gifts. By multiplying this hypothetical price-earnings ratio times Specialty's fiscal 1968 earnings per share, respondent arrived at a figure of $16.56 per share, discounted this figure by 20 percent to account for lack of marketability, and thus valued the stock constituting the gifts at $13.25 per share. Through cross-examination of respondent's expert witness, petitioners demolished the foundation of the analysis - comparability between Specialty and the four companies whose performance was analyzed. [2] Respondent's expert witness failed to consider factors which clearly are guideposts in determining comparability. Among these factors are the company's capital structure, credit status, depth of management, personnel experience, nature of the competition, and the maturity *80 of the business. Moreover, in determining the fair market value of stock where no bid and asked prices and no relevant sales exist, [3] a comparison with the values of securities of corporations engaged in the same or similar lines of business which are publicly traded is only one factor to consider. Sec. 25.2512-2(f) (2), Gift Tax Regs. *81 Of course, the sales of Specialty stock by public offering on October 24, 1968, at $17.50 per share are relevant to the value of the gifts in this case and the public offering price has been a consideration in our finding that the value of the gifts was $12 per share. However, we should not and do not equate the Specialty stock constituting the gifts with the Specialty stock offered to the public. As we stated in Morris M. Messing, 48 T.C. 502, 509 (1967), acq. 1968-1 C.B. 2: In short, a publicly traded stock and a privately traded stock are not * * * the same animal distinguished only by the size, frequency, or color of its spots. The essential nature of the beast is different. Respondent argues that the stock given by petitioners to their children could have been registered for public offering by amending the registration statement. Nevertheless, he admits that a discount for lack of marketability is applicable because the stock was not in fact so registered. We do not doubt that registration statements are amended as a matter of course, and that by *82 amendment, prior to the effective date of the registration statement, the number of shares being registered can be increased. See 17 C.F.R. secs. 230.457(a) and 230.413 (1968 ed.). However, the Specialty stock which constituted the gifts in issue was not registered for public offering, and we will not hypothesize contrary to fact. The essential nature of the gift would have been changed had the stock been registered for public offering. Morris M. Messing, supra. On the other hand, we will not ignore the public offering price in valuing the stock in issue as petitioners would have us do. Although the offering price was not set until the afternoon of October 23, 1968, the selling shareholders had decided when the registration statement was filed that they would not accept a price of less than $10.80 per share and the stock finally sold for $17.50 per share. We think this reveals what the Specialty shareholders believed the stock to be worth. [4] It is our opinion that on the facts of the record before us a willing buyer reasonably apprised of all the relevant facts would have paid $12 per share for the Specialty stock constituting the gifts. *83 Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, unless otherwise specified. ↩
2. Respondent's expert witness testified that he would not recommend a purchase of closely-held stock whose price was determined by this kind of analysis. Moreover, he conceded that the four companies were not comparable to Specialty on the basis of earnings and dividend performance. Rather, he selected the companies because they offered "similar investment opportunities" to Specialty, though he did not elucidate the meaning of this phrase. ↩
3. The only evidence in the record of any sales prior to the public offering was a reference by Tallichet to two sales of five-percent interests in one of the 10 corporations existing in 1966 prior to the B-type reorganization of Specialty. This was two years before the gifts in issue and the interests were sold for five times the corporations earnings. Because petitioners introduced no evidence to support any possible comparison between a sale of Specialty stock and these sales, we find these sales to have no bearing on the valuation question before us. ↩
4. Petitioners argue that the size of the two gifts of 10,000 shares should result in some blockage discount. Blockage is a matter of evidence, not of doctrinaire assumption. William J. Rushton, 60 T.C. 272, 279↩ (1973). Petitioners have failed to prove its applicability here.