STEPHEN ZOKOYCH, Plaintiff-Appellee, *v.* BRUCE SPALDING *et al.*, Defendants-Appellants.

First District (5th Division)    No. 82—2186

Opinion filed May 4, 1984.

922

Jerome H. Torshen, Ltd., of Chicago (Jerome H. Torshen, Abigail K. Spreyer, and Curtis B. Ross, of counsel), for appellants.

Defrees & Fiske, of Chicago (Edward J. Griffin and W. Michael Seidel, of counsel), for appellee.

JUSTICE WILSON delivered the opinion of the court:

This appeal arises from the third trial between plaintiff and defendants where evidence was presented on the question of the value of Ample Tool and Manufacturing, Inc. (Ample), a closely held company in which Stephen Zokoych and Bruce Spalding (Spalding) were

the principal shareholders. Ample ceased doing business in 1970.

In the first appeal (*Zokoych v. Spalding* (1976), 36 Ill. App. 3d 654, 344 N.E.2d 805) we affirmed the trial court's award to plaintiff of compensatory damages and further held that because defendants were guilty of fraud and conspiracy, the court's award of punitive damages was not an abuse of discretion. The court's decision that the evidence did not establish a value for Ample was reversed, however, and the case was remanded with directions to determine the value of Ample and to award plaintiff additional damages for one-half that amount.

Four years later this matter was again presented on appeal, this time by plaintiff, and in a second decision we reversed the trial court's finding that Ample had no value beyond the net value of its assets. (*Zokoych v. Spalding* (1980), 84 Ill. App. 3d 661, 405 N.E.2d 1220.) Because of the retirement of the first judge and the demise of the second, we remanded for a trial *de novo* to determine the actual value of Ample as of May 1970. The trial court found that Ample's value was $420,000 and entered judgment for plaintiff, along with prejudgment interest in the amount of $127,047 which was calculated at the statutory rate of 5% per year from 1970. Defendants now appeal. The allegations presented for review are: (1) whether the trial court improperly relied on testimony given by plaintiff's expert witness, John Langum, as to the value of Ample; and (2) whether the award of prejudgment interest was improper. We affirm in part and reverse in part.

First, plaintiff presented two witnesses who testified as to the value of Ample based on the 10-month period (July 1969 to April 1970) prior to Spalding's fraudulent transfer of the company's machinery and equipment. Both of these witnesses, Dr. John K. Langum, an economist, and Joseph McCauley, a Chicago businessman, had previously testified in the earlier trials.

Langum first explained that for closely held corporations, there are generally two methods to determine stock value. The first value, which in Langum's judgment was more useful, is to capitalize the earnings of a privately held company, which initially calls for ascertaining the amount of net income of the company and then multiplying the amount by a determined price-earnings ratio.[1] Since there are

---

[1]According to the Dictionary of Business and Economics (C. Ammer, 1977), a price-earnings ratio is the current market price of a share of stock divided by the company's earnings per share for 12 months. A high price-earnings ratio usually implies that investors anticipate that future earnings will be markedly higher than present earnings.

no market prices for the stock of a privately held corporation, one must look at the price earnings ratio of the most comparable public companies with listed stock. The second method of evaluation is to relate the price at which a company is purchased to its book value. The market book value is not as acceptable or efficient as the capitalization of earnings method but is sometimes used, Langum stated. Although he used this second method, it was only to check his "basic evaluation."

In Langum's judgment, after studying Ample's tax returns for 1962 through 1970, its financial statements for 1969 and 1970 as well as other factors, the market value of Ample as of April 30, 1970, was $420,000. This figure was based on the company's net income as of April 1970 of $60,000 and a price earnings ratio of seven. Langum then explained that in order to obtain the $60,000 figure he relied on the records and statements of Ample's accountant, Jack Schwartz, who testified at the first trial that Ample's net income for the 10-month period of July 1969 to April 1970 was approximately $50,000. Langum then divided this figure by 10 and multiplied it by 12 in order to yield an annual rate. The 10-month period was used in his analysis because the tool and die industry had recovered from an industry recession by that time. Also, in 1970 Ample's sales volume had increased 55% over what it was in 1962. There was a "good market" and "market possibilities [were] being utilized," Langum stated. Langum then explained that he selected 32 companies to compare to Ample because their businesses were most similar to Ample's.

Testifying further, Langum stated that he relied on McCauley's testimony in the first trial as to the 1969 market value of Ample's machinery and equipment, but that he adjusted this figure by making a deduction for the sale of certain machinery and equipment and by adding the amount of machinery and equipment purchases. Depreciation was also deducted, which yielded a net book value for these items.

Under cross-examination, Langum testified that 23 of the 32 companies he had selected to compare to Ample were not strongly financed, based on their earnings and dividends; that he compared the number of employees of these companies with Ample but that that comparison was not a criteria as to whether to include or exclude the company and that although he did not compare the number of plant facilities that each company had with Ample, he did compare the earnings history of these companies to determine whether the general business of Ample and the 32 were similar. Langum did not compare the companies' dividend history, debt structure or management per-

formance but relied on information provided by the American Institute of Management. He stated that the basis of his comparison of the companies with Ample was principal business undertaking and product line. None of the 32 companies showed a negative net worth on their balance sheets.

Testifying further under cross-examination, Langum said that he had not studied the ability of the 32 companies to service their debt although he was aware that in certain years they experienced net losses which limited their ability to do so. He also did not compare the nature of Ample's debt to its net worth with the nature of the debt of the companies to their net worth. Langum had never made a valuation of a company based on a 10-month earning record and did not know whether any of the selected companies needed an infusion of capital to continue its operation. He further acknowledged that he "perhaps" should have studied whether any of the 32 companies were financially weaker than Ample but explained that he used the price earnings ratio of seven because it was the lowest ratio for any of the companies.

Under redirect examination Langum said that Ample experienced a "very strong and impressive increase in dollar volume" starting in 1962, followed by a loss in profits in 1967 from $24,751 to a deficit of $10,306 in 1968. He also said that he studied the comparative companies' investments, earnings and the progress of their sales and profits and that these factors formed "a very adequate basis" to determine which companies would be selected. Langum further stated that he made a substantial discount in the multiplier to account for differences in size and other factors. This analysis resulted in Langum's final decision to apply a price-earnings ratio of seven.

Next to testify was Joseph McCauley, president of Marathon Corporation, which manufactures components for metal die sets and springs. McCauley testified that he had been employed by Marathon for 27 years. His qualifications included an undergraduate degree in chemistry and math from Northwestern University and "about 50 percent of the work done" for a master's degree in business administration. McCauley also held a law degree from John Marshall Law School.

McCauley stated that he was familiar with the metal manufacturing industry in the Chicago area because he had sold products to these companies for over 20 years. Also, Marathon had been a member of the Tool and Die Institute of Chicago for 25 years. McCauley stated that he had extensively purchased and sold machinery and equipment used in the metal manufacturing industry, most recently at

an auction in 1980. He said that his company supplied die sets as well as other materials to Ample from 1962 to 1970 and that he was aware that plaintiff was responsible for the company's promotion and sales and that Spalding oversaw production and manufacturing. In Mc-Cauley's opinion, the two worked extremely well together.

McCauley first made an evaluation of Ample in 1969 when plaintiff asked whether he would be interested in buying into the company. McCauley evaluated Ample's assets, income, books and records and conducted a physical view of the machinery and equipment in order to determine a reasonable purchase price. He stated that the final value he placed on the machinery and equipment was $200,000 and small tools were valued at $25,000. Although plaintiff later rescinded his "buy in" offer to McCauley, McCauley continued to do business with Ample until 1970.

Further testifying, McCauley stated that after Spalding returned to Ample in 1969 its operations immediately changed from unprofitable to profitable as determined by the company's financial statements and bill payments. McCauley's company was Ample's largest trade creditor, he said, and after Spalding returned to Ample acceptable terms of payment were arranged whereby McCauley began receiving regular monthly payments for approximately three months but then, "they started slowing down again."

Prior to trial, McCauley reviewed Ample's tax returns from 1962 through 1970 and its monthly reports for that period as well. He stated that based on these documents, the company's financial statements (particularly after Spalding's return in 1969), and his personal knowledge of Ample's assets, in his opinion, Ample's value immediately prior to the transfer of its assets in May 1970 was $650,000.

McCauley then testified that his calculations revealed that Ample's sales averaged $41,000 per month for the four-month period prior to Spalding's departure but increased to $50,000 per month after he returned, which McCauley attributed to a general recovery in the economy and because plaintiff was not beset by plant responsibilities and was "free to do what he did best." Expenses for outside services declined from $8,300 to $4,288 per month as did labor costs.

McCauley further testified that he used $60,000 as Ample's yearly earnings instead of $53,000, which was the figure he used in the first trial because, he said, his calculations during that trial were based only on earnings for 10 months rather than one year. Using a second or alternative method of evaluation which took into account Ample's net assets, equipment appreciation, the owners' salaries and perquisites (boat, horse and other items), McCauley said that Ample's esti-

mated value was $722,145. He then took the average between his valuation at the first trial, $571,000 and his second valuation, $722,000, which yielded his current and final valuation of Ample of $650,000.

Cross-examination disclosed that although McCauley had previously purchased metal companies, he had not purchased a tool and die company and had never used a multiplier as part of a formula to arrive at the value of a company when making a purchase. Also, when McCauley examined Ample's plant equipment he did not know how much of that equipment did not belong to Ample. This factor was not "something you really focus your attention on right at the beginning," he explained. Testifying further, McCauley said that he added discretionary cash into his evaluation of Ample by "adding back" the owner's salaries, interest, and perquisites because it was money which could be used at the complete discretion of plaintiff and Spalding. He explained that his primary consideration in evaluating a company was to first determine how long it would take him to recoup his purchase price if he bought the company and that the company's earning history and customer lists would be important factors in making this decision.

Next to testify was plaintiff Zokoych who reviewed the history of Ample, his co-ownership with Spalding and the events leading up to the cessation of business in 1970. Plaintiff answered questions about his and Spalding's salaries after Spalding returned to the company in 1969, personal expenses Ample paid for and a company loan for over $100,000 from defendant West Suburban Bank as well as a loan from the same bank to Spalding for $15,000 which plaintiff stated he had not been aware of at the time it was made.

Cross-examination disclosed that Ample did not own any copyrights, did not have any secret processes to manufacture tools and that its only trademark was its name. Following plaintiff's testimony about the various metal products that Ample manufactured, redirect examination was waived and plaintiff rested his case.

Defendant then called Walter Bissell, a chartered financial analyst and group vice president of Duff and Phelps, an investment analysis and financial consulting firm. In Bissell's opinion, Ample had no meaningful value or earning power as of April 1970. He testified that after Spalding returned to Ample the company showed a fairly impressive sales volume for July, August and September which exceeded sales for the same period in 1968. September through May 1970 showed a downward trend and by March and April sales had fallen to levels below the comparable period in 1968.

Testifying further, Bissell stated that although Ample reported

$50,000 in pretax earnings for the 10-month period, approximately $49,000 of that was registered in three months. Consequently, Bissell said, the following seven months were at a break-even level and the overall trend was unfavorable.

A final step Bissell took in analyzing Ample's performance was to exclude from earnings a $16,000 sale of machinery in 1969 because, he said, Ample was not in the business of buying or selling machinery and equipment. Bissell also reduced earnings by $36,000 for plaintiff's and Spalding's salaries.

As a result of this analysis, Bissell concluded that Ample had a very weak financial condition with a negative working capital and negative net worth. He further determined that Ample's pretax income for the 10-month period was $9,128, versus a reported figure of approximately $50,000. Ample had a "break even level of profitability subsequent to September 1969," he said.

Testifying further, Bissell said that he did not know of any company that had been valued on the basis of an annualization of 10 months' earnings. In this case, he added, the company experienced earnings for an initial period, followed by losses for three years. Bissell stated that when a company either had no earnings or no meaningful earnings, one must look at asset values either through liquidation or a gradual winding down of business. When a company *does* have earnings the approach Bissell used was a comparative company approach between the private company and the most similarly publicly traded company. In this analysis, the final step is to look at the public market valuation measures for the public companies and then assign a value to the private company based on its ranking within this peer group. Bissell did not use company comparisons since, in his opinion, Ample had no earning power, equity or working capital.

Bissell also testified that none of Langum's 32 companies were directly similar to Ample and that few, if any, were directly comparable to each other even though all were engaged in metal work and several were affected by the same industry and economic factors. But unlike Ample, he said, all of the companies showed a positive working capital or assets in excess of liabilities at the end of their latest fiscal year and all showed a positive net worth. Several were "large enterprises," Bissell pointed out, adding that one company had a net worth of $191 million and another $320 million. The lowest net worth figure was $2.4 million. By contrast, Ample's net worth was a negative $90,000. Bissell concluded that for these reasons, there could not be a meaningful comparison between those companies and Ample.

In conclusion, Bissell stated that he would have classified the

money advanced by the bank to plaintiff and Spalding as loans rather than capital investments because they had been treated as such by the Internal Revenue Service. He added that if a company has no demonstrated earning power, one must look to assets, "frequently with a liquidation scenario in mind."

Under cross-examination, Bissell testified that based on its statements, Ample showed a pretax profit of $50,000 which, when annualized, would be $60,000; that a standard method of valuing a business was to apply a multiplier to the annual rate of net income; that he had studied a summary prepared by one of plaintiff's witnesses but had not examined Ample's tax returns and that he had not made an attempt to determine whether Ample had purchased any machinery. Bissell further admitted that Ample's tax records showed an upward trend in machinery purchases from 1962 to 1968 which indicated that the company apparently was able to buy substantial amounts of machinery and equipment. Bissell explained, however, that although Ample purchased a great deal of machinery, it had no significant sales until 1970 and that the purchases could indicate that the company was putting money back into its business in order to upgrade its manufacturing capability.

Under further cross-examination, Bissell stated that in May 1970 Spalding contacted Ample customers and told them to reissue their orders to his company (Spalding Manufacturing) and that during that same month plaintiff's salesman was fired. This activity could conceivably affect earnings for that month, Bissell acknowledged, further agreeing that the fact that Ample's machinery and equipment had been disconnected and physically removed would also have an impact. Bissell also agreed that after Spalding returned, Ample's labor expenses returned to the level they had been three or four years earlier but that he did not make any adjustments in his figures to reflect these changes.

Bissell was also unaware that for the month of October 1969 machinery sales were made but were unrecorded and that prior to the termination of its business in May 1970 Ample had never missed a monthly payment of $2,000 on loans from defendant West Suburban Bank totaling approximately $131,000. He agreed that the regularity of the payments suggested that the bank expected that the company would be able to continue in business and to meet its financial obligations. Also, Bissell was unaware that the tool and die industry experienced a recession in 1969 prior to the general economy.

Continuing cross-examination, plaintiff introduced into evidence a book entitled How to Profitably Sell or Buy a Company by F. Gordon

Douglass which Bissell stated he was unfamiliar with. After reading a portion of the book at plaintiff's request, Bissell acknowledged that Douglas proposed adjusting a company's earnings by salaries, perquisites and taxes. Following a redirect examination, defendants rested their case. The court then denied both sides' post-trial motions and subsequently ruled in favor of plaintiff.

The court stated that of the three witnesses, Langum had the highest degree of credibility and that his testimony had the greatest impact. Although Langum's comparative companies were more strongly financed than Ample, the court added, Langum studied their earning histories and still concluded that their comparability would permit him to make a meaningful analysis.

McCauley's testimony was important as to the history of Ample, the personalities of its principals and its sales and future expectations and to that extent he corroborated the conclusions upon which Langum bases his studies. The court further stated that McCauley's evaluation methods and conclusions were not persuasive.

The court then said that Bissell's testimony that Ample's sales volume was impressive after Spalding returned to the company confirmed Langum's conclusions. Also, the court noted, Bissell admitted that the standard way to evaluate a business was to use a multiplier. "*** Mr. Bissell admits that Dr. Langum's procedure is standard but quarrels with Ample's sustainable earnings," the court noted, adding that "In this regard McCauley, the plaintiff Zokoych and Dr. Langum all testified as to the rosy outlook for Ample and the belief that in 1970 the earnings *** which were projected were sustainable."

The court then held that the value of Ample on the date of evaluation was $420,000, that plaintiff was entitled to one-half that amount and that it would award prejudgment interest to plaintiff because of defendants' "gross conduct." Following the entry of judgment on this ruling, defendants appealed.

OPINION

The principal question for our determination concerns the trial court's finding as to the value of Ample, a closely held corporation which ceased doing business in 1970. We note at the outset, however, that upon review the trial court's finding (which, in this case was the basis upon which plaintiff's damages were determined), will not be reversed unless it is palpably or manifestly contrary to the weight of the evidence. *Stewart v. D.J. Stewart & Co.* (1976), 37 Ill. App. 3d 848, 856, 346 N.E.2d 475.

## I

Challenging the evidence presented, particularly that of plaintiff's expert, Langum, defendants initially contend that Langum's method of valuation was based on a superficial, one factor analysis which relied on the price earnings ratios of 32 publicly traded companies whose only potential similarity to Ample was product line or business activity.[2] Because these companies were incorrectly chosen, defendants posit, the trial court's acceptance of Langum's analysis and conclusions was in error. We disagree.

■ Contrary to defendants' postulation, we believe that there was sufficient evidence upon which the court could reasonably conclude that a meaningful comparison could be made because the comparative companies were properly selected. Langum specifically testified that in selecting an appropriate price earnings ratio or multiplier to use to compute the value of Ample's stock, he first examined data on approximately 5,000 companies to see whether there was "any appreciable investment interest" as indicated by Standard and Poor's. Langum then went through a stock guide and found 319 companies (excluding steel and automobile companies) that used iron and steel in their manufacturing process. Next, he considered information on certain industrial corporations in Barrons (an investment news publication), Moody's investment service, Standard and Poor's and the Dow Jones 30 industrials. From this list he "selected and studied particularly thoroughly" the price earning ratios for 32 companies according to their standard industrial classification code and the description of their business according to Standard and Poor's. These companies all used iron and steel and were engaged in metal work.

Langum then stated that he further "made several studies of these companies from different standpoints to consider their proper use as a guide." These "different standpoints" included the companies' earnings and dividend ranges to ensure that their stocks were not highly priced, the "behavior of sales [from] year to year," the "company as a whole," and "certain aspects of their net income." Langum made a chart showing the price earnings ratio for each company and decided to use the lowest ratio of the companies that were engaged in metal work. As a result of this analysis, the ratio figure selected was the number seven.

---

[2]We note that in valuing the stock of a closely held corporation, the use of the listed stock prices of comparable, publicly traded corporations has received both judicial and legislative sanction. See *Central Trust Co. v. United States* (U.S. Ct. Cl. 1962), 305 F.2d 393; I.R.C. sec. 2031(b) (1983).

Langum further testified that in his opinion, the 32 selected companies were the most closely comparable to Ample. He explained that "that certainly doesn't mean identical. *** There never will be [an identical company]. But comparable to means affording a reasonable and meaningful comparison. *** [T]hese are larger companies, but they are engaged in the similar line of business, and hence, comparable ***."

The question of whether publicly held corporations are truly comparable remains a question of fact for the trial court. (See *Estate of Ethel C. Dooly v. Commissioner* (1972), 31 T.C.M. (CCH) 814, 820. Also see *Jones Brothers Bakery, Inc. v. United States* (U.S. Ct. Cl. 1969), 411 F.2d 1282, 1291, where the principle of comparability between companies within the same industry was applied to determine the reasonableness of compensation paid to an officer in a family-owned company.) Indeed, at least two of defendants' cases which address the issue of comparative appraisal support this view.

In *Estate of Victor P. Clarke v. Commissioner* (1976), 35 T.C.M. (CCH) 1482, 1501, the court determined that comparable does not mean "essentially identical" because that interpretation would be "*** unduly restrictive, as it strips the inquiry into the valuation of closely-held stock of the flexibility needed to make an informed judgment. Rare indeed would be the corporation identical to that being valued ***." The court stated further that a meaningful comparison involved an interplay of a myriad of complex factors and features, including the companies' products, management, earnings, dividend paying capacity, book value and their position in the industry.

Also, in *Righter v. United States* (U.S. Ct. Cl. 1971), 439 F.2d 1204, the court held that the comparative appraisals used were entitled to "little if any weight." In that case, a small closely held company manufactured two principal products, "Scrabble," a popular crossword puzzle game, and "Parcheesi," a backgammon game. In determining the value of the company's stock for estate tax purposes, however, the defendant selected several publicly held companies that manufactured either toys or toys *and* games. Defendant's comparison was thus rejected because, the court ruled, the products of the comparative companies "appeal to and are used by different age groups." 439 F.2d 1204, 1217.

In the case at bar, defendants further point out that "the great preponderance" of the 32 companies was dissimilar to Ample because they manufactured railroad cars, automobile parts, heating and ventilating equipment, bottle caps, and other items. The record also shows that defendants offered the testimony of their expert, Bissell, who

stated that unlike Ample, several of the companies were "large enterprises" and all showed a positive net worth.

As the preceding cases suggest, however, there is no fixed rule for determining comparability. Rather, our focus is on the fact that each of the comparative companies had the same standard industrial classification as Ample, each supplied parts, machinery or equipment to other companies engaged in basic manufacturing, all were engaged in metal work and, as Bissell acknowledged, all were affected by the same economic factors. Equally important, *Langum testified that he considered other factors* in determining comparability. These factors were: (1) the products of the respective companies; (2) the markets served by the companies; (3) the dividend history of the comparables; (4) book value; (5) each company's position in the industry; and (6) management performance. Langum also testified that he considered the companies' sales behavior each year, whether the companies were listed on the stock exchanges (Langum stated that 11 were not) and the companies' net income. In our view, these additional refinements to Langum's initial selection of companies based on their industrial classification renders his analysis highly credible and effectively distinguishes this case from those cited by defendant where the court rejected the comparative companies used. *Estate of Newcomer v. United States* (W.D. Pa. 1978), 447 F. Supp. 1368; *Estate of Helen Baker Jenner v. Commissioner* (1977), 36 T.C.M. (CCH) 241; *Estate of Joseph E. Salsbury v. Commissioner* (1975), 34 T.C.M. (CCH) 1441.

Additionally, we note that defendants' basic argument on this issue as to the uncomparability of Langum's 32 companies was unsuccessfully presented before this court in the second appeal of this matter and was rejected. As heretofore stated, we find this argument untenable.

Following our ruling in the second appeal that the trial court's decision that Ample had no value as a going concern was against the manifest weight of the evidence, we stated that:

"*** defendant's arguments to the contrary are untenable, for a number of reasons. *** Fourth, defendant posits that the companies relied upon by Dr. Langum to establish a price-earnings ratio significantly differ from Ample in size, history, product line, investor interest, and all other relevant factors. We note, however, that defendant's witness Drebin agreed on cross-examination that Dr. Langum's method of valuation is commonly used; that Langum testified that the 32 companies used for his analysis were the most comparable of companies listed on national stock exchanges; and that the 32 companies

were engaged in a business similar to that of Ample. Even assuming that those companies were not sufficiently comparable to Ample to establish a price earnings multiplier of 7, we nonetheless believe that the court's conclusion that Ample had no earning power was incorrect ***." *Zokoych v. Spalding* (1980), 84 Ill. App. 3d 661, 670-71, 405 N.E.2d 1220.

We thus conclude that the weight of the evidence in the case at bar supports the trial court's decision that Langum's testimony was credible.

## II

■ Further challenging the sufficiency of the evidence presented, defendants next contend that even if the 32 companies selected by Langum were comparable in terms of product line or business undertaking, they were dissimilar in several other respects. Defendants point to Langum's testimony under cross-examination where he stated that he did not conduct a comparison between Ample and the 32 companies with regard to the following features:

1. number of employees;
2. number of plant facilities;
3. dividend history;
4. debt structure;
5. management performance;
6. whether any of the companies had a negative working capital or negative net worth as shown on their balance sheet;
7. The ability of the companies to service their debts;
8. The nature of the comparative companies' debt to their net worth as compared to Ample's.

By way of comparison, however, the cases defendants cite on this issue set forth the following "fundamental" factors which, along with other relevant considerations depending on the facts of each case, should "ordinarily" be considered in determining the comparability between a closely held corporation and those to which it is compared:

1. products;
2. market;
3. management;
4. earnings;
5. dividend paying capacity;
6. book value;
7. position in the industry of each company;
8. capital structure;
9. credit status;

10. personnel experience;
11. maturity of the business.

*Estate of Victor P. Clarke v. Commissioner* (1976), 35 T.C.M. (CCH) 1482, 1501; *Cecilia A. Tallichet v. Commissioner* (1974), 33 T.C.M. (CCH) 1133, 1135.

Our review of the record reveals that of the 11 factors cited in the cases above, Langum testified either under direct or cross-examination that he had considered at least seven of these items, which were: (1) the products of the respective companies; (2) the markets which were served by the companies; (3) the dividend history of the comparables; (4) book value (Langum stated that the method of using the book value of a company to determine the value of its common stock was not as reliable as the method he used.); (5) the position in the industry of each company; (6) management (Langum explained that "*** matters of management performance do enter into earnings and do enter into investory expectations about earnings and they enter into price earnings ratio, so all those matters have been considered and have been weighed in the market in some fashion.") and, (7) maturity (Langum testified that he had thoroughly studied Ample's initial growth and sales record.).

We further note that in regard to defendants' list of factors cited above, plaintiff properly cites to the record wherein Langum further testified that he was "aware" of the debt structure of some of the companies as well as Ample's but did not make a *formal* comparison; that he was "aware" that in certain years the companies experienced net losses which limited their ability to service debts; and, that he compared the companies' number of employees and plant facilities.

The foregoing testimony convinces us that the weight of the evidence supports the trial court's finding that Langum properly considered relevant factors in determining the value of Ample and the comparability of the 32 companies. For this reason, defendants' argument on this issue will be rejected.[3]

## III

■ Further challenging Langum's analysis, defendants contend that his valuation was improperly based on a price earnings ratio of only 10 months and that he failed to make any adjustments for the

---

[3]We note that plaintiff argues in his brief on appeal that because defendants' brief addresses the comparability of only 22 specifically named companies, defendants concede that the remaining 10 companies are comparable. We find no such "concession" by defendants, however, and therefore address the 32 companies as a group.

sale of machinery, the failure to pay Spalding a regular salary upon his return or for the lack of marketability of Ample's stock. We cannot agree.

First, when asked as to why he used the 10-month period from July 1, 1969, to April 30, 1970, to compute Ample's net income, Langum stated that he did so because (1) after reading the first trial testimony of Jack Schwartz, who began to keep the books of the company in July 1969, Langum said that he felt he could "rely on his [Schwartz] statements and accounts as a basis for determining [Ample's] income"; (2) Spalding came back into the business at that time; (3) McCauley had testified in the first trial that Spalding and plaintiff "were a good combination *** and a very good team *** with good customers"; (4) the recession in the tool and die industry had "run its course" by that time and had begun a period of recovery; and (5) the company experienced a "breakup" by May 1970 since plaintiff had left shortly before then, tools and equipment were physically transferred and sales were diverted because Ample's customers were informed of a change in the business.

Additionally, the record reveals that McCauley again testified in this trial that in his opinion, Ample experienced a dramatic change for the better in sales and an appreciable decline in the amount of money expended for outside labor services during this 10-month period. Plaintiff also testified as to the favorable changes in the company after Spalding's return. We additionally note that defendant's expert, Bissell, agreed that Ample's sales volume was impressive after Spalding came back and that in analyzing Ample, Bissell "would put more emphasis on the recent period, but I would *** also consider historical results as well."

In view of all of the foregoing testimony, along with the fact that Langum and McCauley were knowledgeable as to the history, growth and subsequent demise of Ample, that they so testified and reasonably chose to place greater emphasis on the 10-month period in question, we believe that the evidence supports the trial court's decision to adopt Langum's use of the 10-month period to determine the value of Ample. Moreover, the cases defendants cite on this issue are unpersuasive since based on the unique facts involved, the court in those instances decided that the valuation should not be based on less than a year's sales earnings. Unlike Ample, however, none of the closely held corporations in those cases had experienced a dramatic change in earnings and management performance which precipitated a cessation of business. *Estate of John L. Huntsman v. Commissioner* (1976), 66 T.C. 861; *Frederik G.H. Meijer v. Commissioner*

(1979), 38 T.C.M. (CCH) 1347.

As far as Langum's adjustments for the sale of machinery are concerned, the record shows that in setting the value of Ample's machinery and equipment, Langum deducted $16,325 for the sale of equipment during the fiscal year ending February 1970 and that he added $22,931 in machinery and equipment purchases. Adjustments for the depreciation of equipment (a deduction of $79,683) and the acquisition of small tools (an addition of $25,500) were also made. We further believe that Langum's failure to make an adjustment for Ample's failure to pay Spalding a regular salary did not render his evaluation implausible since defendants have failed to bring to our attention any authority which mandates this consideration.

## IV

■ We next consider defendants' contention that Langum failed to make an adjustment for the unmarketable nature of Ample's stock. While it is true that Langum did not make a "dollar amount" deduction to compensate for this factor, he specifically stated under direct examination that he was well aware of the fact that there were no market prices for the stock of a privately held corporation.[4] Moreover, we distinguish *In re Marriage of Rossi* (1983), 113 Ill. App. 3d 55, 446 N.E.2d 1198, cited by defendants on this issue, where the court rejected the evaluation of a closely held corporation. Unlike the expert witness in that case, Langum did *not* place a premium on plaintiff's share of ownership which would inflate its value. 113 Ill. App. 3d 55, 61.

For these reasons, we conclude that the trial court's judgment as to the value of Ample was not manifestly or palpably contrary to the weight of the evidence and therefore will not be disturbed.

## V

■ The final question for our consideration is the trial court's award of prejudgment interest which, the court ruled, was appropriate "due to the gross conduct of the defendants which is set out in detail in the two appellate court decisions which relate to this contro-

---

[4]We acknowledge the fact that in evaluating a closely held corporation, an expert witness *may* take a deduction for its unmarketability, however our review of the cited cases on this issue convinces us that this is not a mandatory requirement, as long as other relevant factors are properly considered. See *Cecilia A. Tallichet v. Commissioner* (1974), 33 T.C.M. (CCH) 1133, 1135; *Estate of Victor P. Clarke v. Commissioner* (1976), 35 T.C.M. (CCH) 1482, 1490; *Drybrough v. United States* (W.D. Ky.) 208 F. Supp. 279, 286.

versy." We believe this award was in error.

It is a general rule in Illinois that interest is not recoverable unless provided for by agreement of the parties or by statute. (*Ochoa v. Maloney* (1979), 69 Ill. App. 3d 689, 695, 387 N.E.2d 852; *Loy v. Booth* (1974), 16 Ill. App. 3d 1077, 1081, 307 N.E.2d 414.) In the absence of an agreement, however, a court of equity is vested with broad discretion in awarding interest and thus may give or withhold interest as it deems equitable and just under all of the circumstances. (32 Ill. L. & Prac. *Interest* sec. 11 (1969).) Cases in which interest has been allowed usually involve an element of bad conduct which constitutes actual or constructive fraud (*Galler v. Galler* (1975), 61 Ill. 2d 464, 474-75, 336 N.E.2d 886 (widow of joint owner improperly denied equal control of the corporation, surviving owner required to pay interest on money due)) or, vexatious delay (*Finley v. Finley* (1980), 81 Ill. 2d 317, 333, 410 N.E.2d 12 (ex-wife deprived of child support for over 10 years)).

In the pending case, our first decision upheld the trial court's award of compensatory damages and further ruled that punitive damages were properly assessed for Spalding's fraudulent action in violating his fiduciary obligation to plaintiff and for the bank's wanton disregard of plaintiff's rights. (*Zokoych v. Spalding* (1976), 36 Ill. App. 3d 654, 670-71, 344 N.E.2d 805.) The only remaining issue was the amount of additional damages plaintiff was entitled to, which amount we ruled should comprise one-half the value of Ample. Even after a second trial, this amount was unsatisfactory, and in our second decision we reversed the trial court's ruling that Ample's value was limited to its assets because it had no earning power.

Thus, in our view, the record does not support plaintiff's contention which suggests that defendants vexatiously caused plaintiff to endure a lengthy period of litigation. This argument, in effect, appears to be that had defendants not defrauded plaintiff, plaintiff would have not been forced to "endure" three trials to recover additional damages. We are not persuaded by this argument. Rather, we believe that the equities were balanced by the trial court's original award to plaintiff of punitive and compensatory damages. The disputed issue in each successive trial was the *amount* of additional damages owed. Defendants properly exercised their right to appeal the first decision of the trial court; the second appeal was initiated by plaintiff. Following a trial *de novo* on remand, defendants filed the third appeal to this court.

Thus, because defendants did not exercise bad conduct or vexatious delay in litigating the question of the amount of damages owed

to plaintiff, we conclude that the trial court's award of prejudgment interest was an abuse of discretion and is therefore reversed.

Affirmed in part and reversed in part.

LORENZ and SULLIVAN, JJ., concur.